688 So.2d 657 (1997)
STATE of Louisiana, Plaintiff-Appellee,
v.
Joel D. INGRAM, Defendant-Appellant.
No. 29172-KA.
Court of Appeal of Louisiana, Second Circuit.
January 24, 1997.
*659 Hunter, Scott, Blue & Johnson by Robert C. Johnson, for Defendant-Appellant.
Richard Ieyoub, Attorney General, Jerry L. Jones, District Attorney, Jimmy D. White, Assistant District Attorney, for Plaintiff-Appellee.
Before NORRIS, HIGHTOWER and BROWN, JJ.
*660 NORRIS, Judge.
Defendant Joel D. Ingram was charged with four counts of aggravated rape in violation of La. R.S. 14:42. A 12-member jury found him guilty on all four counts. He was subsequently sentenced to three concurrent and one consecutive life term at hard labor without benefit on each count. Ingram now appeals his convictions and sentences, alleging 11 assignments of error.[1] For the reasons stated herein, we affirm.

Factual and Procedural History
Ingram was charged with three counts of aggravated rape of a minor girl, K.T., and one count of aggravated rape of her mother, S.T. K.T. was born on October 12, 1980. K.T. and her mother lived with Ingram, S.T.'s boyfriend, from approximately 1987 until October 1994. Ingram is not K.T.'s father and she has had little if any contact with her father since she was nine years old.
Count 1
K.T. testified that shortly after her ninth birthday, defendant and S.T. had an argument and when they finished, they went to their bedroom. Ingram later called K.T. into the bedroom. Over S.T.'s protests, Ingram forced K.T. to hold S.T. and watch as he and S.T. had sex. After this, defendant ordered K.T. to take her clothes off; S.T. protested and defendant slapped her. Defendant then forced K.T. to get in the bed with him, and had both anal and vaginal intercourse with her. Shortly thereafter, Ingram had sex with S.T. a second time, again making K.T. watch.
K.T. testified that when she was allowed to leave the bedroom to take a shower, defendant entered the shower with her and apologized for the incident. K.T. testified that having sex with defendant caused her to bleed heavily; however, she was not allowed to see a doctor because Ingram "didn't believe in doctors." S.T. testified that she did not notify the authorities because defendant threatened to kill her and her daughter if she told anyone what happened. Ingram also told S.T. that if he ever went to jail, he would upon release find and harm her family.
K.T. further testified that a few months after this incident, defendant began having sex with her once or twice a month; eventually these episodes increased in frequency until they occurred two or three times a week.

Counts 2 and 3
K.T. testified that on October 7, 1994 she was intending to spend the night with her best friend, J.M. K.T. arrived at J.M.'s house, and the two of them went out with K.T.'s 17-year-old boyfriend, Danny. K.T. had been previously ordered by Ingram and S.T. not to see Danny. After going out, K.T. and J.M. returned to J.M.'s home around 10:30 p.m.
On the same evening, Ingram discovered some letters written by Danny to K.T. Ingram knew that K.T. and Danny had had sex in the past and these letters led him to believe that K.T. was still seeing Danny against his wishes. S.T. testified that Ingram picked her up from work that same night and told her about the letters from Danny. She agreed to go with Ingram to pick up K.T. from her friend's house, but asked him not to hit K.T. Around 11:00 p.m., Ingram and S.T. arrived at the friend's house and picked up K.T.
Ingram was angry and confronted K.T. about dating Danny in defiance of his orders. K.T. and S.T. both testified that when they reached home, defendant began choking K.T. Ingram then picked her up by her ears and threw her down. S.T. also testified that defendant hit K.T. with his fist some six to eight times during this encounter. As a result of the beating, K.T. testified that her ears turned black, she sustained several bruises on her legs and arms, and several blood vessels in her eyes burst; photos taken on October 10 corroborate her testimony.
During this altercation, S.T. attempted to intervene, and Ingram hit S.T. several times with a hammer. K.T. testified that Ingram and her mother fought for several hours *661 afterward; S.T. testified that the argument lasted for forty-five minutes to an hour.
In the course of the beating, Ingram ordered S.T. and K.T. to follow him to the bedroom. S.T. testified that because Ingram did not want the neighbors to hear the screams and call the police, he ordered them to turn the lights off in their trailer and go into the bedroom. After entering the bedroom, Ingram told K.T., "take off your clothes because you're going to get what you deserve for sleeping around with Danny," and he would show K.T. "a real man." K.T. testified that she was frightened of defendant and therefore complied. S.T. testified that despite her and K.T.'s protests, Ingram had sex with K.T. During this time, Ingram prevented S.T. from leaving the bed, forcing her to hold the girl while he had sex with K.T. After forcing S.T. to watch him have sex with K.T., Ingram then had sex with S.T. and forced K.T. to watch.
K.T. testified that while defendant had intercourse with S.T., S.T. cried and asked him to stop. Whenever S.T. protested, Ingram told her to "shut up" and either grabbed her by the neck or "push[ed] her in the stomach." S.T. also testified that Ingram told K.T. that he would harm Danny if K.T. saw Danny again. Ingram then allowed K.T. to go to her own bedroom. S.T. testified that shortly thereafter, Ingram forced her to have vaginal and anal intercourse with him. S.T. testified that she attempted to push Ingram off of her, but he overpowered her. S.T. stated she did not call the police because Ingram had threatened her with knives and guns in the past. S.T. testified that Ingram also threatened to kill her and K.T. if they ever told anyone about what he did. He also told her he would take K.T. away to live elsewhere, and she would never see K.T. again.
K.T. testified that she did not physically resist Ingram's sexual advances because he would have forced her to comply had she resisted. Ingram had just throttled and violently beaten her. She testified that Ingram again warned her not to tell anyone about what had happened, and if she did, he would kill her, S.T., and the rest of their family. K.T. also testified that she did not report the incidents because she believed Ingram's threats and feared he would kill her and her mother.

Count 4
The following morning, K.T. testified that she awoke around 5 or 6 a.m. and found Ingram in her room. Ingram once again forced her to have intercourse with him, despite her crying and her requests not to. K.T. testified that during this encounter, Ingram hit her with a lighter and slapped her in the face. She stated that she believed he would hurt or kill her if she refused to have sex with him. Later, Ingram apparently then told S.T., "I got some of your daughter again" and then left the trailer to go hunting. K.T. admitted that Ingram was not holding a dangerous weapon on her while he was raping her on the night of October 7th or the morning of October 8th.
After defendant left to go hunting on October 8th, K.T.'s friend J.M. visited K.T. and observed bruises on her neck. K.T. had previously revealed to J.M. that Ingram was sexually abusing her and now K.T. told J.M. about the recent abuse. J.M. later notified the authorities.
On Monday, October 10, 1994, a Ouachita Parish Sheriff's deputy and a social worker from the Louisiana Department of Social Services met with K.T. at her school. After K.T. informed them that she had been sexually abused, the deputy contacted S.T., and S.T. and Ingram eventually arrived at the school. The deputy requested Ingram go back to work, and took K.T. and S.T. to another location to discuss the matter further.
S.T. initially denied knowing anything about any sexual abuse of K.T. and admitted at trial that she was scared that defendant would make good on his threats and kill her if she told authorities. Ingram had threatened her intermittently yet often concerning these matters. S.T. ultimately allowed the deputy to take a videotaped statement from her daughter; several pictures of K.T. and S.T. were also taken.
Dr. Meade O'Boyle, an expert in the field of pediatrics, examined K.T. pursuant to a request by the Department of Social Services. Dr. O'Boyle's examination of K.T. *662 produced findings consistent with vaginal penetration by a penis. She testified that her examination found evidence of significant injury to K.T.'s anus in the form of old scars. Her findings were consistent with an adult male penis being violently inserted into K.T.'s anus.
The sheriff's deputy later asked Ingram to come to the sheriff's office for an interview with both the deputy and the Social Services worker. The deputy and the social worker testified that Ingram was advised of his rights, signed a waiver form, and agreed to talk with them. According to the deputy, Ingram stated that he had found notes from a boy to K.T. in K.T.'s room. Ingram admitted shaking K.T. and hitting S.T. once with a hammer. The deputy testified that Ingram also admitted having sex with both K.T. and S.T. after this confrontation. According to the deputy and the social worker, Ingram also admitted having sex with K.T. the next morning. In response to an inquiry regarding the incident which occurred when K.T. was nine years old, Ingram admitted having sex with K.T. when she was "real young," but stated he did not remember whether it was anal sex on that occasion. The social worker testified that she distinctly remembered Ingram admitting that he knew K.T. was nine years old at the time. Furthermore, both the deputy and social worker testified that defendant admitted having sex with K.T. through the years, sometimes as a means for K.T. to avoid being grounded. Ingram allegedly told the deputy and social worker that K.T. "can't get enough of men."
After giving this oral statement, Ingram refused to give a recorded statement. The deputy then read back her notes of the oral statement and asked defendant to sign them, if correct. Ingram signed them, stating that the deputy's notation of "did it" meant "had sex." The deputy made the addition to her notes at his request.
Defendant testified at trial on his own behalf and stated that throughout his eight-and-a-half-year, on-and-off relationship with S.T., he had a good relationship with K.T. Ingram testified that after K.T. went to J.M.'s house on October 7th, he entered K.T.'s room to obtain some of his hunting equipment, which was kept in her closet. He testified that he accidentally discovered the letters from K.T.'s boyfriend Danny which referred to them having sex. These letters convinced him that K.T. was still seeing Danny against his wishes. He testified that he and S.T. then went to pick K.T. up and confronted her about the letters. Ingram stated that when they returned home with K.T., he began to whip her with a belt and admitted to choking K.T. Ingram stated that during this episode, S.T. obtained a hammer and began hitting him with it. He fought with S.T. for the hammer and when he gained control, hit her with it. Ingram stated that when he later calmed down, he apologized to both K.T. and S.T.
Ingram denied ordering K.T. to go to the bedroom with him and S.T. and having sex with K.T. that night, or the following morning. He stated that he did have sex with S.T. on the night of October 7th, but asserted that it was consensual. Ingram testified that he had no idea why S.T. and K.T. would testify as they had against him, but that it might be because they were angry about him beating them on October 7th.
Ingram further testified that the deputy who interviewed him did not inform him of his right to remain silent, and when he requested a lawyer, she simply informed him that he was not being charged with anything, and that she was "just asking questions." He stated that the deputy "did all the talking" during the interview and that he initially denied ever raping K.T. Ingram testified that in response to the deputy's repeated questions, he eventually began saying "yeah, whatever," because he "didn't want to hear it anymore." R.p. 615; cf. R.p. 624. He admitted that he had a "cocky attitude" and was "tired of answering their questions"; however he asserted that he never in his own words stated that he had sex with K.T. After he talked with the deputy and social worker, he was placed under arrest and the deputy asked him to sign a piece of paper. He stated that he only remembered signing two pieces of paper, but admitted that the deputy's notes did bear his signature. Ingram also denied ever asking the deputy to insert *663 the word "sex" for "did it" in her written notes.
Defendant testified that the deputy only read him his rights after she arrested him and after he gave a statement. He testified that after he was arrested, the deputy asked him if he wanted to give a recorded statement but he declined because he "had talked to them enough."

Discussion
Defendant designated eight "initial assignments of error" in the trial court, but assigns eleven in brief. R.p. 112. The scope of review is limited to those errors designated in the assignments of error and those discoverable by mere inspection of the pleading. La.C.Cr.P. art. 920. Assignment Nos. 8, 9, & 10 are not found in the initial assignments of error. Thus, in order for the issues alleged in these assignments to be properly before this court, defendant would have had to file supplemental assignments of error with the trial court in accordance with La.C.Cr.P. arts. 844, 916(1) and 920. Such were not filed and we are therefore constrained to find that those three assignments which appear only in brief are not properly before the court for review.[2]State v. Spell, 399 So.2d 551 (La.1981).

Sufficiency of the Evidence
By two assignments of error, Ingram charges that the evidence was insufficient to support his conviction. If a court reviewing a criminal conviction finds the evidence insufficient to support a guilty verdict, the constitutional protection against double jeopardy bars retrial of the defendant. Hudson v. Louisiana, 450 U.S. 40, 43, 101 S.Ct. 970, 972, 67 L.Ed.2d 30 (1981); See U.S. Const. amend. V, XIV. All other issues in the case become moot. State v. George, 95-0110 (La.10/16/95), 661 So.2d 975; State v. Hearold, 603 So.2d 731 (La.1992). The appellate review standard is whether, after viewing the evidence, both admissible and inadmissible, in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Famous, 27,593, p. 3 (La.App.2d Cir. 1/24/96), 667 So.2d 1209. The Jackson standard applies to cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances must be sufficient for a trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Ford, 26,422 (La.App. 2 Cir. 9/21/94), 643 So.2d 293.
This court's authority to review questions of fact in a criminal case is limited to the sufficiency of the evidence evaluation under Jackson v. Virginia, supra, and does not extend to credibility determination made by the trier of fact. La. Const. Art. 5, § 5(C); State v. Williams, 448 So.2d 753 (La.App. 2d Cir.1984). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Silman, 95-0154, p. 12 (La.11/27/95), 663 So.2d 27, 35; State v. Rogers, 494 So.2d 1251 (La.App. 2d Cir.1986), writ denied, 499 So.2d 83 (1987). It is not the function of appellate courts to reevaluate the credibility of witnesses and then proceed to overturn factual determinations of guilt. State v. Lewis, 577 So.2d 799, 801 (La.App. 2d Cir.), writ denied, 582 So.2d 1304 (La.1991). If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. Id. at p. 12, 663 So.2d at 35.
Aggravated rape is the act of anal or vaginal sexual intercourse committed without the person's lawful consent because it is committed *664 under any one or more of the following circumstances:
(1) When the victim resists the act to the utmost, but whose resistance is overcome by force.
(2) When the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution.
(3) When the victim is prevented from resisting the act because the offender is armed with a dangerous weapon.
(4) When the victim is under the age of twelve years. Lack of knowledge of the victim's age shall not be a defense. * * *
La. R.S. 14:42 A.[3]
The testimony of the victim alone is sufficient to prove the elements of the offense even where the state does not introduce medical, scientific, or physical evidence to prove the commission of the offense by the defendant. State v. Walters, 26,888, p. 3 (La.App.2d Cir. 5/10/95), 655 So.2d 680, 682, and citations therein.

Count 1
This count arises from defendant's rape of K.T. in 1989, when K.T. was nine years old, under the age of 12. La. R.S. 14:42 A(4). S.T. and K.T. both testified in detail that defendant had intercourse with K.T. when she was nine years old. Their testimony was corroborated by Dr. O'Boyle, who through her examination was able to identify scars which were consistent with violent penetration.
Ingram argues that his testimony contradicted that of K.T. and S.T.; however, the jury apparently found the testimony of K.T. and S.T. more credible. Defendant next argues that K.T.'s credibility is questionable because she did not promptly report the rape to other family members or the police. However, on cross-examination, K.T testified that she was afraid of what the defendant might do if she told anyone. Finally, defendant argues that the state produced no medical evidence to support the allegation that K.T. was raped in 1989, arguing that Dr. O'Boyle's findings can be explained by K.T.'s admitted sex with two boys in recent years.
The testimony of the victim of a sex offense, if believed, is sufficient to prove the elements of the offense. State v. Walters, supra. K.T.'s testimony, which was supported by S.T.'s, sufficed to establish that defendant committed the crime of aggravated rape. Dr. O'Boyle's findings of extensive scarring and evidence of prior violent penetration were consistent with the theory that defendant raped K.T.; the jury was free to disbelieve defendant's contention that these injuries were caused by K.T.'s consensual sex acts with two teenage boys. The law does not allow us to upset this credibility call. State v. Richardson, 425 So.2d 1228 (La.1983). On this record we cannot say the evidence is insufficient to support the conviction. State v. Lee, 526 So.2d 450 (La.App. 5 Cir.1988). As to count 1, this assignment lacks merit.

Counts 2 and 3
These counts arise from defendant's rape of both K.T. and S.T. on or about the night of October 7, 1994. Defendant renews his previous argument that K.T. and S.T. were not credible, and that the state did not introduce physical evidence, such as medical reports, to show that a rape had taken place. As noted above, we will not disturb the jury's decision to accept S.T. and K.T.'s account of the offense over Ingram's denials.
Defendant also argues that "the alleged rape of [S.T.] was never reported to the police or investigated by them as a rape to this date. In fact, the only crime that was reported to the police that appellant allegedly perpetrated on [S.T.] was the offense of aggravated battery."
Moreover, defendant argues that because K.T. did not see the hammer in the bedroom when he raped her, and no other evidence indicates that he was actually armed with the hammer, the evidence does not support a conviction pursuant to La. R.S. 14:42 A(3). Defendant also argues that the evidence does *665 not suffice for a rational juror to determine that defendant violated La. R.S. 14:42 A(1) or (2).
The evidence will support a determination that when defendant raped K.T. and S.T., they were prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution. La. R.S. 14:42 A(2) "envisions that the victim does not have to physically resist when she is prevented from resisting by her assailant where his actions are tantamount to threats which place her in fear of great bodily harm accompanied by apparent power of execution." State v. Douglas, 256 La. 572, 584, 237 So.2d 382, 386 (1970), vacated as to death sentence, 408 U.S. 937, 92 S.Ct. 2864, 33 L.Ed.2d 756 (1972), on remand, 263 La. 294, 268 So.2d 231 (1972). The "threats" described in § 42 A(2) need not be made verbally or through the exhibition of a dangerous weapon; they may be express or implied by the offender's conduct toward the victim, "provided she is placed in such fear by the array of physical force that she dares not resist." Id. at 585-86, 237 So.2d at 386-87. In addition, the statute proscribes rapes perpetrated through means of threats of great and immediate bodily harm upon a third person whom the actual victim is legally, morally or emotionally obliged to defend. State v. Crochet, 354 So.2d 1288, 1296 (La.1977).
The testimony of K.T. and S.T established that shortly after they arrived home on the evening of October 7, defendant brutally beat them. Ingram picked K.T. up by her ears and threw her to the floor, throttled her with such force that her eyes hemorrhaged, and repeatedly hit her with his fists, all in keeping with a long pattern of abuse. This beating lasted at least one hour. Dr. O'Boyle testified that the force was "violent" in order to produce the injured eyes and degree of bruising she saw. He also hit S.T. with a hammer several times. He had continuously threatened to kill them and their relatives if they informed anyone about the ongoing abuse in the household. Defendant's actions were clearly tantamount to threats which placed them in fear of great bodily harm accompanied by apparent power of execution. See Douglas, supra. Had K.T. or S.T. resisted defendant, they had every reason to expect even more physical abuse. The high degree of force defendant was prepared to employ against his victims had they resisted him is clearly illustrated by the degree of force he had already employed against them that evening. Under Crochet, each victim's fear that defendant would harm the other if she resisted suffices to sustain a conviction under La. R.S. 14:42 A(2).
The evidence before the jury is sufficient to convict defendant of aggravated rape. As to counts 2 & 3, this argument lacks merit.

Count 4
This argument attacks defendant's conviction for the aggravated rape of K.T. on the morning of October 8. Defendant renews his argument that K.T.'s testimony should be rejected because the state did not present medical evidence tending to show K.T. was raped on October 8, and because defendant's testimony rebuts that of K.T.
He argues that K.T.'s testimony does not support a finding that he was guilty of aggravated rape pursuant to La. R.S. 14:42 A(1), (2) or (3). However, defendant's conduct is proscribed by La. R.S. 14:42 A(2). Although K.T. did not testify that on this occasion defendant explicitly threatened her in order to force her to have sex with him, Douglas makes it clear that the "threats" proscribed by § 42 A(2) may be express or implied under the circumstances. The evidence clearly shows that Ingram had subjected K.T. to a steady pattern of threats, intimidation and sexual abuse for five years, culminating in threats and a beating, and an aggravated battery of S.T. in K.T.'s presence, just hours before the October 8th incident. On these facts the jury was entitled to find that Ingram prevented K.T. from resisting him by implicit yet real threats of great and immediate bodily harm when he had the apparent power to execute. As to count 4, this argument lacks merit.
There was sufficient record evidence for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of all four counts of aggravated rape. This assignment of error has no merit.

*666 Motions for mistrial

By his fifth assignment in brief, defendant argues the trial court erred in not granting a mistrial on three occasions. On each occasion the state or K.T. made reference to "other crimes" committed by defendant.

The State's Opening Statement
The first allegedly impermissible reference to other crimes occurred in the state's opening statement which read as follows:
The next date that comesthat comes to play that is importantplease remember this is still ongoing, but October 6 of 1994. This is aR.p. 238.
Defendant objected to the statement arguing that the prosecutor's reference to "ongoing" abuse amounted to a reference to other crimes and that the reference was so vague that the jury would believe that the abuse was ongoing, even between 1992 and 1994. Defendant was charged in Count 1 with aggravated rape of K.T. between October 12, 1989, and October 11, 1992, inclusive. R.p. 18. Count 2 of the indictment alleged that defendant committed the aggravated rape of K.T. on October 7, 1994. R.p. 18. Defendant was not charged with any crime occurring between 1992 and 1994.
In response, the prosecutor stated, "I said ongoing activity and then I said the next date that wasand the reason I did that is specifically to stay out of specific conduct that occurred between 1992 and 1994." R.p. 240. The trial judge then stated that the jury would be instructed that count 1 was between 1989 and 1992 only. Overruling the defendant's motion, the court determined that there was no mention of other evidence or crimes which warrant a mistrial. R.p. 244. Because the rest of the state's opening statement was not transcribed and made part of the record, we have no way of knowing whether the district court actually made an admonition to the jury.
La.C.Cr. P. art. 770 provides, in pertinent part:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to: * * *
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible[.]
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial.
La.C.Cr. P. art. 770.
Although this statute is couched in mandatory terms, it is a "rule for trial procedure." Thus, the introduction of inadmissible "other crimes" evidence results in a trial error subject to harmless error analysis on appeal. State v. Johnson, 94-1379, p. 16-17 (La.11/27/95), 664 So.2d 94, 101-02. Trial error is harmless where the verdict rendered is "surely unattributable to the error." Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).
The state's general remarks were not "direct or indirect" reference to other crimes committed by defendant. La.C.Cr.P. art. 770. The D.A.'s explanation clarified only specific acts were being charged and the court apparently admonished the jury to consider only those crimes. Nevertheless, even if it were a reference to other crimes, the statement was harmless error because the jury's verdict was surely unattributable to that statement. The prosecutor's ambiguous statement was apparently not repeated when his opening statement resumed. Likewise, the foundation of the state's case was not this obscure portion of its opening statement, but the testimony of S.T. and K.T.
We accord credit to the good sense and fair-mindedness of the jurors who heard the evidence. State v. Prosper, 455 So.2d 673 (La.App. 4 Cir.1984). There is no showing that the prosecutor's comments made it impossible for the defendant to obtain a fair trial and trial judge was not clearly wrong in this determination.

K.T.'s Reference to Other Crimes
The second allegedly impermissible reference was made by K.T. when the state asked her if she had been disciplined in the past for seeing her boyfriend Danny. K.T. responded that, at one point, she had been *667 grounded for a few days for seeing Danny, but that after having sex with defendant this punishment was revoked. Defendant did not object.
The state again asked if K.T. had been disciplined for seeing Danny. Defense counsel interrupted, stating that the question had already been answered. The prosecutor stated that defendant, in his opening statement, had asserted that K.T. had been disciplined for seeing Danny and he had not been aware of this fact. His intent was to ask K.T. if she remembered being disciplined.
The prosecutor then asked K.T. whether she had been disciplined for seeing Danny, to which K.T. responded, "he grounded me but then I got ungrounded for him having sex" The prosecutor interrupted K.T. at this point and stopped his questioning. An unrecorded bench conference was then held and the trial court recessed the jury for lunch.
Before the jury returned after lunch, defense counsel moved for a mistrial, arguing that K.T. had impermissibly referred to other crimes when she stated that defendant had rescinded her punishment after she had sex with him. The state contended that K.T.'s answer had been non-responsive because the prosecutor had only asked her whether she had been disciplined. The trial judge agreed with the state and denied the motion for a mistrial, stating that K.T.'s answer had been nonresponsive. R.p. 273.
Since mistrial is such a drastic remedy, unless mandated by La.C.Cr. P. art. 770, it should only be used in those situations which might result in substantial prejudice to the defendant. State v. Burdgess, 434 So.2d 1062, 1065 (La.1983). The determination as to whether a mistrial should be granted under La.C.Cr. P. arts. 771 and 775 lies within the sound discretion of the trial judge, and denial of a motion for mistrial will not be disturbed on appeal absent an abuse of that discretion. State v. Hattaway, 28,060, p. 6 (La.App.2d Cir. 5/8/96), 674 So.2d 380, 387, writ denied 96-1900 (La.1/10/97), 685 So.2d 141.
A witness's voluntary, unresponsive testimony which implicates a defendant in other crimes does not require a mistrial, at least where the form of the prosecutor's question does not indicate bad faith. See State v. Joseph, 437 So.2d 280, 283 (La.1983); State v. Williams, 26,655, p. 5 (La.App.2d Cir. 3/1/95), 651 So.2d 331, 334.
Though K.T.'s remarks were admittedly prejudicial, they do not rise to the level of depriving defendant of any reasonable expectation of a fair trial. The prosecutor quickly stopped K.T. once she referred to defendant's other crimes. In addition, defendant's actual argument at the time K.T. made the remark in question was simply that the question had already been answered; defendant did not ask for a mistrial until the lunch recess was over and court was about to resume. While a limiting instruction may have been appropriate, defendant did not request one. See State v. Wingo, 457 So.2d 1159, 1166 (La.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2049, 85 L.Ed.2d 322 (1985); State v. Kelly, 576 So.2d 111, 120 (La.App. 2d Cir.), writ denied, 580 So.2d 666 (La.1991). The trial court's refusal to grant a mistrial did not amount to an abuse of discretion in this instance.

K.T.'s Reference of Cruelty to a Juvenile
On cross-examination, defense counsel sought to establish that defendant had been "good to" K.T. (R.p. 281.) He asked K.T. to describe what happened on October 7 when defendant confronted her about the letters from her boyfriend, and then questioned her in detail about the physical abuse defendant inflicted on her.
On redirect, K.T. testified that the first time defendant had beaten her with his fists was when he had initially discovered that she was dating Danny. The prosecutor asked K.T. to describe this incident and then elicited her account of another incident in which defendant beat K.T. and injured one of her eyes.
At that point, defendant objected, arguing that the state was attempting to introduce "other crimes" evidence, namely cruelty to a juvenile. The state argued that the testimony was admissible because defendant had opened the door to it, first by attempting to characterize defendant's relationship with K.T. as one of normal discipline, and second *668 by inquiring why K.T. had not told anyone that she had been abused. Defendant moved for a mistrial. R.p. 331-32. The district judge denied the motion, stating that K.T.'s testimony was admissible to show that K.T. and S.T. were afraid of defendant, and why they allowed him to have sex with them.
A witness who has been cross-examined is subject to redirect examination as to matters covered on cross-examination and, in the discretion of the court, as to other matters in the case. La. C.E. art. 611 D; see State v. Wiley, 614 So.2d 862, 871 (La.App. 2d Cir.1993). A trial court's ruling allowing exploration of such matters on redirect will not be disturbed on appeal absent an abuse of the trial court's "broad discretion." State v. Robinson, 624 So.2d 1260, 1264 (La. App. 2d Cir.1993), writ denied, 93-2899 (La.2/11/94), 634 So.2d 372.
The trial judge did not abuse his broad discretion. K.T.'s testimony on redirect was admissible because defendant opened the door to it on cross-examination. After the defense cross-examined her regarding an uncharged crime as to which the state did not introduce evidence, the court could permit the state on redirect to inquire on the subject as far as is necessary for a proper explanation of the testimony given on the cross-examination regarding the other crime. State v. Graham, 486 So.2d 1139, 1144 (La. App. 2d Cir.), writ denied, 493 So.2d 633 (1986); State v. Huizar, 414 So.2d 741, 750 (La.1982).
The trial judge's refusal to grant a mistrial did not amount to an abuse of discretion.

Excessive Sentence
By four assignments of error, Ingram contests his sentences. Ingram contends that under the circumstances of this case, the mandatory sentence constitutes cruel, unusual and excessive punishment under the Eighth Amendment of the United States Constitution and La. Const. Art. I, § 20. In State v. Foley, 456 So.2d 979 (La.1984), the Louisiana Supreme Court expounded at length on the constitutionality of the mandatory sentence found in La. R.S. 14:42 C. The court stated:
The mandatory life sentence for aggravated rape is a valid exercise of the state legislature's prerogative to determine the length of sentence for crimes classified as felonies. See State v. Prestridge, 399 So.2d 564 (La.1981).
The Supreme Court has held that the penalty provision of La. R.S. 14:42 does not facially violate the state and federal constitutional prohibitions against excessive punishment and we find no reason in this record to deviate from that holding. State v. Foley, supra.; U.S. Const. Amend. VIII; La. Const. Art. I, § 20; see also State v. Davis, 94-2332, p. 13 (La.App. 1st Cir. 12/15/95), 666 So.2d 400, 408, writ denied, 96-0127 (La.4/19/96), 671 So.2d 925. These assignments lack merit.

Conclusion
We have reviewed the entire record and found nothing we consider to be error patent. For the reasons expressed, Ingram's convictions and sentences are AFFIRMED.
NOTES
[1] Although defendant lists 11 assignments of error, only 8 are properly before this court. See p.7 infra. Assignment of error No. 4 in defendant's brief is explicitly abandoned and will not be reviewed. See State v. Wilson, 27,889, p. (La.App.2d Cir. 4/8/96), 672 So.2d 448, 458.
[2] In the case at bar, because three assignments are not properly before the court, no opinion will be written concerning them. We note parenthetically that we have read these assignments and find them to be without merit.
[3] The statute has subsequently been amended to add another circumstance (not applicable in this case) in which rape is considered aggravated and to authorize the death sentence for aggravated rape of a victim under age 12. La. Acts 1993, No. 630; La. Acts 1995, No. 397.