715 So.2d 488 (1998)
STATE of Louisiana
v.
Harold CAMPBELL, a/k/a Charles Campbell.
No. 97-KA-0358.
Court of Appeal of Louisiana, Fourth Circuit.
May 20, 1998.
Rehearing Denied June 15, 1998.
*489 Dwight Doskey, Orleans Indigent Defender Program, New Orleans, for Appellant Harold Campbell, a/k/a Charles Campbell.
Harry F. Connick, District Attorney of Orleans Parish, Fortune' A. Dugan, Jr., Assistant District Attorney of Orleans Parish, New Orleans, for Appellee State.
Before BARRY, BYRNES and WALTZER, JJ.
WALTZER, Judge.

STATEMENT OF THE CASE:
Harold Campbell, a/k/a Charles Campbell, was charged by grand jury indictment with aggravated rape, a violation of La. R.S. 14:42. He was arraigned, waived reading of the indictment, entered a plea of not guilty and orally filed motions to suppress the confession, identification and evidence. The motion to suppress was denied. A lunacy hearing was held and Campbell was found competent to stand trial, whereupon Campbell withdrew his former plea of not guilty and entered a plea of not guilty and not guilty by reason of insanity. A mistrial was declared on 13 September 1993. Following a second trial on 29 October 1996, a twelve-person jury found Campbell guilty as charged. On 15 November 1996, Campbell was sentenced to serve life at hard labor in the custody of the Department of Corrections without benefit of probation, parole or suspension of sentence. Campbell appeals his conviction and sentence.

STATEMENT OF THE FACTS
Aline Campbell testified that she was married to Campbell for approximately ten years. She said Campbell worked the night shift and would be at home when she left around 7:00 a.m. to take the couple's younger child to school. The victim, Mrs. Campbell's son, was approximately fifteen-years-old at that time, took a later bus to school and also would be at home when she left. Mrs. Campbell testified that, at some point in March, 1992, the victim complained to her that his rectum was itching and he could not have a bowel movement. She left him with her mother one Friday because of the pain and, she recalled, Campbell objected to the victim not being allowed to stay at home. The next day, Saturday, Mrs. Campbell's sister telephoned her and said the victim was very, very sick. Mrs. Campbell took the victim, who had fever, nausea, vomiting and delirium, to the hospital. The victim was *490 admitted into the hospital and Mrs. Campbell was told he had herpes. After these events, Mrs. Campbell found a letter written to her in Campbell's handwriting. She read it aloud into evidence. It stated:
I know you're going through a lot of changes and that you are confused. But trust in me now like never before. What happened between Al [sic] is his stage of becoming a man. It was a father-son discovery of realization of self. It could only happen between a father and son that he would become aware of the do's and don'ts. Believe in this and trust. Now he needs you. You must be tender and affectionate. I trust him, but if you defile me, he will curse you to your face. Know that he knows himself, even if he cannot express. Trust him and ask no questions.
Mrs. Campbell testified that she had been tested for herpes subsequent to the events involving her son and that she did not have herpes.
Dr. Laura Waltrip, a general medicine physician with specific training in sexual assault cases, was assigned to the Charity Hospital emergency department in 1992. Dr. Waltrip examined the victim in March, 1992, and said he complained mostly of rectal pain. Dr. Waltrip said that the victim's anus was red with "blister-like things" around the anus and rectum extending to the buttocks. She said she recognized the rash as a classic, very severe herpes infection; she suspected sexual abuse was involved. The victim related to her that, about 7:00 a.m., approximately a week earlier, his stepfather came into his bedroom while he was sleeping and began pulling his pants down. The victim told her he began to struggle, and his stepfather forced him down on the bed and put his penis into the victim's rectum. She said the victim was unsure if his stepfather had ejaculated. Dr. Waltrip said the victim was in a great deal of pain and the infection was so severe the victim had been unable to have a bowel movement for a few days. Dr. Waltrip testified that the victim was incredibly quiet, sort of embarrassed and ashamed, looking down, and not speaking in a loud voice. On cross-examination, Dr. Waltrip said that she had not done an analscopy or proctoscopy at that time because of the severity of the infection and the danger of introducing more infection through the use of those instruments. She performed an external examination, but did not see any other damage.
Dr. Terry Cummings was qualified as an expert in the field of pediatric and general medicine. He testified he had examined approximately one hundred patients with active herpes infections. Dr. Cummings diagnosed the victim with herpes and proctitis. He said the victim gave a history of, approximately one week prior, having his stepfather come into his room, hold is arms down, and raped him. Dr. Cummings calculated that, based on the onset of the victim's complaints of pain, muscle aches and fever, which he had noted as 26 March 1992, sexual contact would have been six days prior, on March 20th. The victim came into the emergency room on 28 March 1992, which would have been one-and-a-half days prior to the peak of systemic symptoms. He said the victim presented a classic case of primary herpes infection, meaning the first episode of the infection, manifested by severe fever, aches and a lot of pain. Dr. Cummings testified that later, recurrent episodes of herpes are milder and often asymptomatic; he said he had never treated any individual with recurring bouts of herpes with as many symptoms as presented by the victim. Dr. Cummings was asked how it was possible for someone to have an active sexual relationship with another person who has herpes and yet not contract it themselves. He explained it would be more likely for herpes to be transmitted in cases of anal intercourse as opposed to vaginal intercourse, because the former is more traumatic to the body. Dr. Cummings testified that he did not believe there was a test that would show with one hundred percent certainty whether one person infected another person with the herpes virus and made no attempt to definitively determine who infected the victim.
Detective Eddie Gia, assigned to the New Orleans Police Department's rape section, investigated the rape. He said the victim was groggy, going in and out of consciousness, at Charity Hospital when he first attempted to interview him. After speaking *491 with the victim a second time, Detective Gia interviewed Campbell, advising him of his Miranda rights prior to questioning. Campbell signed a rights-of-arrestee form, indicating he understood his rights. Campbell denied the allegations, and said he believed his son was involved with another male and that was how he contracted herpes. He was willing to be tested for herpes and to furnish the officer with a copy of the test results. Campbell turned some lab results over to Detective Gia who had the results interpreted by Charity Hospital personnel. Detective Gia subsequently arrested him.
Detective James Dupuis, assigned to the New Orleans Police Department's Crime Lab, performed a handwriting analysis comparing the inculpatory letter allegedly written by Campbell to a known sample of his handwriting. He said the handwriting in both samples was the same.
Angie Salter, a former medical technician at Roche Biomedical Laboratory, performed approximately 90-120 tests for herpes each week, and tested a blood sample submitted by Campbell. Ms. Salter testified as to the safeguards involved in the lab procedures, from handling blood samples to personally calibrating the testing machine, which she did for each set of tests. She testified that the sample of Campbell's blood registered 4.20 on the scale for Herpes Simplex II, genital herpes, which she characterized as a "high positive" result. Ms. Salter stated that a high positive reading does not necessarily indicate that the person has an active infection, but that at some point the person was exposed to herpes and his body produced antibodies.
Dr. Charles Bowers, Jr. testified that Campbell came to him in April, 1992, and asked to be tested for herpes. Dr. Bowers sent him to Roche Biomedical Laboratories for testing. He said the results showed a high positive of 4.20. He said the history given by Campbell and his physical examination showed no indication of herpes infection. He had first seen Campbell in 1971 and had never treated him for herpes. However, Dr. Bowers said the test results indicated Campbell had Herpes Simplex II. He said he had been using Roche Biomedical Laboratories for quite a while and that their testing was usually accurate.
The victim testified that around 7:00 a.m. on the morning of Friday, 20 March 1992, Campbell came into his room while he was sleeping. He said he was on his side when Campbell first approached him, grabbed his gym shorts, and pulled them off. He later said he was lying on his back. He kept asking Campbell what he was doing and told him to stop. The victim said Campbell, who was much bigger than him, grabbed his hands and prevented him from doing anything. He said he attempted to kick Campbell with his knees, whereupon Campbell raped him. He said he did not immediately tell anyone of the rape because he was embarrassed. He began to feel a burning and itching in his anal area about Wednesday or Thursday of the following week. That Friday, he had fever, was feeling weak, and did not go to school. On Saturday, his mother took him to the hospital. He had burning, itching, and could not "use the bathroom." He said he was told he had herpes and said he still has it. He did not know of any other place he could have contracted herpes.
Campbell testified that he pleaded guilty to car theft in 1980 and was put on probation. At the time of the crime, he was a substitute teacher and drove a tour buggy at night. He said that at the time of this incident, he and his wife were having sexual relations. He said police picked him up at his job in the French Quarter and took him to police headquarters to talk to him. Campbell stated that he went for testing voluntarily. He admitted giving the blood test results to Detective Gia. He denied having attacked the victim and said he never had any sort of sexual relations with him. Campbell admitted having written the letter to his wife. He said when he mentioned "father and son discovery," he was referring to conversations with the victim, wherein he was "trying to discover [the victim's] orientations of what he was doing. [The victim] was an introvert with me. I couldn't get through to him." He said he was trying to relate to the victim because he thought his mannerisms were not "manly, so to speak." He felt the victim was "sometimes" "kind of feminine." Campbell *492 said the letter referred to him trying to get the victim to ride horses with him. Campbell said he was in prison for four years awaiting trial and was never treated for any sort of venereal disease.

ANALYSIS

Errors Patent Review:
A review of the record reveals no errors patent.
Counsel's Assignment of Error No. 1: The trial court used the wrong standard in finding the defendant competent to proceed.
Generally, a trial court's determination of a defendant's competence is reviewed to determine whether the trial court abused its discretion. State v. Bickham, 404 So.2d 929 (La.1981). However, where, as here, the court has committed an error of law[1], this Court reviews the record de novo. State v. Silva, 96-0407 (La.App. 4 Cir. 9/3/97), 699 So.2d 487, writ denied 97-2578 (La.1/30/98), 709 So.2d 704.
Dr. Kenneth Ritter testified at the June 17, 1993, lunacy hearing in the instant case. It was stipulated by both sides that Dr. Ritter was an expert in the field of psychiatry. However, defense counsel stipulated that another physician who apparently had examined Campbell, Dr. Medina, was an expert only in the field of medicine. It was stipulated by the State and defense counsel that the testimony of Dr. Medina would have been the same as Dr. Ritter's had Dr. Medina testified. Dr. Ritter examined Campbell on the morning of trial. He said Campbell suffered from chronic paranoid schizophrenia and was not on any medications at that time. Dr. Ritter testified that Campbell was competent to proceedthat he knew what he was charged with; he knew the seriousness of the charge and the penalty; he could assist his attorney and effectively participate in his defense; and he "passed the Bennett criteria." Dr. Ritter said Campbell had not been on any medications since 1985. Dr. Ritter had previously examined Campbell as part of a sanity commission "years ago."
Dr. Ritter referred to the criteria set out in State v. Bennett, 345 So.2d 1129 (La.1977), where the court noted appropriate considerations for determining whether a defendant is fully aware of the nature of the proceedings and is able to assist in his defense. Those considerations were as follows:
[W]hether he understands the nature of the charge and can appreciate its seriousness; whether he understands what defenses are available; whether he can distinguish a guilty plea from a not guilty plea and understand the consequences of each; whether he has an awareness of his legal rights; and whether he understands the range of possible verdicts and the consequences of conviction. Facts to consider in determining an accused's ability to assist in his defense include: whether he is able to recall and relate facts pertaining to his actions and whereabouts at certain times; whether he is able to assist counsel in locating and examining relevant witnesses; whether he is able to maintain a consistent defense; whether he is able to listen to the testimony of witnesses and inform this lawyer of any distortions or misstatements; whether he has the ability to make simple decisions in response to well-explained alternatives; whether, if necessary to defense strategy, he is capable of testifying in his own defense; and to what extent, if any, his mental condition is apt to deteriorate under the stress of trial. (Citations omitted).
345 So.2d at 1138.
By referring to the "Bennett criteria," Dr. Ritter clearly intended to convey to the court that all of the criteria set out in Bennett favored Campbell's being fully aware of the nature of the proceedings and able to assist in his defense. No contrary medical evidence *493 was presented. Accordingly, we find from the record that Campbell failed to prove by a preponderance of the evidence that he lacked the capacity to proceed.
This assignment or error has no merit.
Counsel's Assignment of Error No. 2 and Pro Se Assignment of Error No. 1: The evidence was insufficient to support conviction of the crime of aggravated rape.[2]
This court set out the standard for reviewing convictions for sufficiency of the evidence in State v. Egana, 97-0318, pp. 5-6 (La.App. 4 Cir. 12/3/97), 703 So.2d 223, 227-28. In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, and viewing the record as a whole, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law.
The elements of aggravated rape as they apply to this case are: (1) anal sexual intercourse with a male person committed without the person's lawful consent, where there is even the slightest penetration; (2) the victim resists the act to the utmost, but his resistance is overcome by force. La. R.S. 14:41, 14:42; State v. Johnson, 94-0236, pp. 8-9 (La.App. 4 Cir. 3/16/95), 652 So.2d 1061, 1068, writ denied, 95-1752 (La.2/21/97), 688 So.2d 524.
Appellate counsel argues that the evidence was sufficient to support only a conviction for forcible rape. La. R.S. 14:42.1.
The Louisiana Supreme Court compared the offenses of aggravated rape and forcible rape in State v. Parish, 405 So.2d 1080 (La. 1981), on rehearing:
There is no essential difference between the specific results required by each crime definition. Both require that the victim be prevented from resisting by threat of great harm under circumstances where the victim reasonably believes that resistance would be futile.... The only distinction between aggravated and forcible rape is the degree of force employed and the extent to which the victim resists.... Nevertheless, the jury is authorized to subject a guilty defendant to more severe punishment by convicting him of aggravated rape rather than forcible rape....
We conclude, therefore, that it was the legislative aim to divide the continuum of acts of coerced sexual intercourse into two categories, aggravated rape and forcible rape, thereby assigning to the jury the function of fixing the range of permissible punishment for convicted offenders by returning a verdict which appropriately fits the crime and the degree of force employed. Accordingly, the question we are called upon to decide is whether any reasonable jury, viewing all of the evidence, in the light most favorable to the prosecution, could find beyond a reasonable doubt that the defendant actively desired to cause the specific results required by both the aggravated and forcible rape statutes and that the degree of force employed warranted punishment in the greater, rather than lesser, degree.... [Citations omitted.]
In Parish, the victim of an attempted rape testified that the defendant, who outweighed her by approximately 130 pounds and was almost a foot taller than her, seized her by the throat, clasped her mouth so that she was unable to breathe and became weak, said he wanted to make love, warned that he would kill her if she screamed, and dragged her toward a bedroom. During the struggle the victim lost a contact lens, had her blouse torn and received a small cut near her eye. The court found that, within the range of coercive sexual acts, the offense fell among those involving "minimal use of force." The court said that although the victim was frightened and perhaps disturbed psychologically, she was released "substantially unharmed." Accordingly, the court held that the evidence supported only a conviction of attempted forcible rape, rather than attempted aggravated rape. 405 So.2d at 1082, 1087.
*494 In State v. Helaire, 496 So.2d 1322 (La. App. 3 Cir.1986), writ denied, 503 So.2d 13 (La.1987), the victim tried to resist her stepfather's advances by moving away, but he grabbed her by the arm and pulled her into a bedroom, pulled down her panties, got on top of her and forced her to have sexual intercourse with him. The defendant held the victim's arms as she screamed and asked him to stop. She stated the defendant was too heavy for her to get out from underneath him. The victim testified the defendant threatened to harm her and her mother. The court discussed forcible rape and aggravated rape, and found the evidence sufficient to support a conviction for aggravated rape because of defendant's threats and the facts that the victim was only fourteen at the time of the offense and the defendant was much heavier and stronger than she was. The court concluded that the jury could have found that she resisted the act to the utmost.
The victim in the instant case testified that Campbell was much bigger than he; that Campbell pulled the victim's shorts off and grabbed the victim's hands, thus preventing him from resisting; that the victim kept telling Campbell to stop; and that he also resisted by attempting to kick Campbell with his knees. There was no evidence that Campbell struck or threatened the victim. As in Helaire, Campbell was the victim's stepfather and was bigger than the victim. Thus, as in Helaire, the jury reasonably could have found that the victim resisted the rape to the utmost but his resistance was overcome by forceby virtue of the defendant's size, parental authority, and his holding of the victim's hands.
Campbell, pro se, attacks the victim's credibility, citing alleged inconsistencies in the victim's testimony and the police report. The victim testified that he was first on his side and then on his back. This might be explained by the victim's having been on his back when Campbell first accosted him, but on his back later during the attack when he tried to kick Campbell with his knees. The police report indicated the victim said Campbell turned him over on his stomach to rape him. This can be explained as a reporting error. Campbell notes the reporting officer said the victim said he was wearing trousers and underwear, which Campbell allegedly removed. Also, during his testimony Detective Gia stated the victim told him Campbell pulled down his pants. This can be explained as a reporting error, compounded by Detective Gia, who may have refreshed his memory by reviewing the police report prior to the trial. Campbell also questions how he could have physically managed to hold the victim down and rape him. Finally, Campbell cites the fact that there was no external physical evidence of forcible penetration.
The testimony of the victim alone is sufficient to establish the elements of the offense. State v. Ingram, 29,172, p. 10 (La. App. 2 Cir. 1/24/97), 688 So.2d 657, 664, writ denied, 97-0566 (La.9/5/97), 700 So.2d 505. The determination of credibility is a question of fact within the sound discretion of the trier of fact and will not be disturbed unless clearly contrary to the evidence. State v. Vessell, 450 So.2d 938, 943 (La.1984). The discrepancies cited by Campbell are not sufficient to undermine the validity of the jury verdict and the conviction.
The victim testified to the rape. The evidence established that the victim now has the same strain of herpes for which Campbell has antibodies. The victim's infection was his first outbreak and, according to the medical evidence, could have resulted from sexual contact on the day he said the rape occurred. The victim's testimony is consistent with the medical evidence. The victim's demeanor at the hospital was consistent with his being embarrassed about the rape and thus not reporting it until a week later at the hospital. Reviewing this evidence, the evidence previously discussed, and all of the evidence as a whole, in a light most favorable to the prosecution, any rational trier of fact could have found all of the essential elements of the crime of aggravated rape present beyond a reasonable doubt.
This assignment of error has no merit.
Defendant's Pro Se Assignment of Error No. 2: Campbell's due process rights were violated because of the delay in commencing trial.
Campbell was charged with a non-capital felony offense. Pursuant to La. *495 C.Cr.P. art. 578, trial had to be commenced within two years from the institution of prosecution. Campbell was indicted by grand jury on 9 July 1992. Because Campbell moved for and obtained a continuance on 30 November 1992, trial was timely commenced on 13 September 1993. On that date, counsel for Campbell moved for a mistrial, which motion was granted by the trial court. The State did not seek supervisory review of that ruling by the trial court. Pursuant to La. C.Cr.P. art. 582, the State had one year from the date the mistrial was ordered to commence the second trial. Campbell's second trial was not commenced until 29 October 1996, over three years later.
Campbell filed a motion to quash on 25 October 1996, alleging that the State had denied him due process by denying him the right to a "speedy trial." The trial court denied the motion to quash on the day of trial, 29 October 1996. Defendant's motion to quash should be treated as one filed under La.C.Cr.P. art. 581, claiming expiration of the time limitation in La.C.Cr.P. art. 582.
The State has a heavy burden of justifying the apparent untimely commencement of trial on the grounds that the time limits were either interrupted or suspended. State v. Joseph, 93-2734, p. 1 (La.6/3/94), 637 So.2d 1032.
The one-year time limitation of La. C.Cr.P. art. 582 is subject to interruption by any of the causes stated in La.C.Cr.P. art. 579. La.C.Cr.P. art. 583; State v. Brown, 451 So.2d 1074, 1079 (La.1984). In addition, although La.C.Cr.P. art. 583 specifically provides for interruption of the one-year limitation only for the causes stated in La.C.Cr.P. art. 579, the period of limitation is also suspended, under La.C.Cr.P. art. 580, where a defendant files a motion to quash or "other preliminary plea." State v. Brown, supra. A motion for continuance filed by a defendant is a preliminary plea under La.C.Cr.P. art. 580 which suspends the running of the time limitation. State v. Fabacher, 362 So.2d 555, 556 (La.1978).
Pursuant to La.C.Cr.P. art. 580, the filing of a motion to quash or other preliminary plea suspends the running of the periods of limitation until the ruling of the court, "but in no case shall the state have less than one year after the ruling to commence the trial." Id. Thus, from the date the trial court grants a defendant's motion for continuance, or rules on a motion to quash, the State has one year to commence trial. State v. Fabacher, 362 So.2d at 557; State v. Harris, 29,574, pp. 3-4 (La.App. 2 Cir. 5/7/97), 694 So.2d 626, 628-29.
On the day it granted the defense motion for a mistrial, the court set a trial date of 15 November 1993. The State was granted several continuances, and a trial date of 12 May 1994 was pending when the defense asked for the first of three continuances, the last of which was granted on 11 August 1994, with trial set for 9 November 1994. As of 11 August 1994, under La.C.Cr.P. art. 580, the State had one year in which to commence trial. Within the year, on 22 March 1995, Campbell filed a motion to quash, which was denied that same date. As of 22 March 1995, the State had one year to commence trial. On 20 June 1995, within the year, Campbell filed another motion to quash in this court as an application for supervisory writs. This court transferred the motion to quash to the trial court, which ruled on that motion on 26 September 1995.[3] On 3 November 1995, Campbell sought supervisory review of the denial of his motion to quash. This court denied relief on 20 November 1995.[4] Therefore, as of 20 November 1995, the State had one year to commence trial. In addition, the defense was granted continuances on 19 October 1995 and on 10 January 1996, giving the State until 11 January 1997 within which to commence trial. Finally, on 29 May 1996, this court denied a motion to quash filed by Campbell in the Supreme Court and transferred to this court for consideration.[5] Therefore, the State had until 30 May 1997, *496 to commence trial. We conclude that the 29 October 1996 trial was, therefor, timely.
There is no merit to this assignment of error.

CONCLUSION AND DECREE
Having found no errors patent, and no meritorious assignment of error by counsel or by Campbell pro se, we conclude that the record below supports Campbell's conviction and sentence for the crime of aggravated rape.
CONVICTION AND SENTENCE AFFIRMED.
BARRY, J., dissents with reasons.
BARRY, Judge, dissenting with reasons.
I respectfully dissent. The State did not prove the crime of aggravated rape. Sufficient evidence was not produced to prove the elements of aggravated rape that the victim resisted to the utmost but his resistance was overcome by force. The distinction between aggravated and forcible rape is the degree of the force employed and the extent to which the victim resists. There was no testimony that the defendant used violence on the victim; he did not strike or beat the victim. There is no evidence that the defendant threatened to harm the victim or his mother as in State v. Helaire, 496 So.2d 1322 (La. App. 3 Cir.1986), writ denied 503 So.2d 13 (La.1987).
The victim testified that the defendant, who was bigger than he was, grabbed his hands during the rape. The State did not prove aggravated rape. I would reverse the conviction for aggravated rape and find the defendant guilty of the responsive verdict of forcible rape.
NOTES
[1] In Cooper v. Oklahoma, 517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996), the court held that states may not require defendants to prove their capacity to proceed by any standard of evidence greater than a preponderance of evidence. In State v. Frank, 96-1136 (La.10/4/96), 679 So.2d 1365, 1366, the Louisiana State Supreme Court held that the decision in Cooper applied to supersede La.C.Cr.P. art. 648(A) insofar as the statute requires proof by clear and convincing evidence. The court held that Cooper had returned Louisiana to the jurisprudential rule that a criminal defendant need prove his incapacity to proceed only by a preponderance of the evidence. Id.
[2] In this assignment, the defendant also raises an error which apparently occurred during his first trial, in which a mistrial was declared. It is not relevant to this appeal and is not before this court.
[3] State v. Campbell, 95-K-1828 (La.App. 4 Cir. 9/14/95), unpub.
[4] State v. Campbell, 95-K-2394 (La.App. 4 Cir. 11/20/95), unpub.
[5] State v. Campbell, 96-K-1096 (La.App. 4 Cir. 5/29/96), unpub.