J^PLOTKIN, Judge.
Johnny R. Handy was convicted of aggravated rape and aggravated burglary. He was sentenced to life imprisonment without benefit of parole, probation or suspension of sentence as to the aggravated rape conviction. Defendant was sentenced to fifteen years at hard labor without benefit of parole, probation, or suspension of sentence for the aggravated burglary conviction. Defendant has appealed his conviction, asserting three assignments of error. We affirm the convictions and amend the sentence for aggravated burglary, for the reasons stated below.

STATEMENT OF THE CASE

By bill of information dated July 25, 1996, defendant was charged with one count of aggravated rape, a violation of La. R.S. 14:42(1), and one count of aggravated burglary, a violation of La. R.S. 14:60. Defendant pleaded not guilty to each charge. The trial court denied a motion to suppress the identification at a hearing on October 11, 1996. After trial, on April 24, 1997, a twelve-member jury found defendant guilty as charged on each count. On June 16, 1997, defendant was sentenced to life imprisonment without benefit of | {.parole, probation, or suspension of sentence on the aggravated rape conviction, and to ten years without benefit of parole, probation, or suspension of sentence on the aggravated burglary conviction. Defendant’s motion for a new trial was denied.[1] The State filed a multiple bill. After a hearing on June 30, 1997, the trial court found the defendant to be a second offender and vacated the ten-year sentence. The *933 trial court resentenced defendant to fifteen years at hard labor without benefit of parole, probation, or suspension of sentence as a second offender under La. R.S. 15:529.1. The sentences are to run concurrently.

STATEMENT OF THE FACTS

Dr. Susanne White-Simms, an expert in rape forensics, testified that she reviewed the medical records of the victim, D.L., concerning the alleged rape. The Woods Lamp examination revealed sperm on the victim’s labia. Seminal fluid was tested for blood type, and the test indicated that the donor’s blood was type “O”. D.L. has blood type “B”; and the defendant has blood type “0”, the most common blood type. Dr. Simms-White testified that the test showed that the victim had had sexual intercourse.
Detective Dennis Dejean of the Rape Investigations Unit testified that he answered a call about 2:00 a.m. on May 8, 1996, to investigate at 4214 Darby Street. At that address, he noticed that a table had been placed under an open window on the side of the house. Det. Dejean concluded that the perpetrator had been able to enter the house through that window into the kitchen. Inside, he found the house orderly except for the bedroom, where the bed was “messed up” and | ¡¿terns were on the floor. When he interviewed the victim, the officer found that she knew her attacker and gave his name, John Handy, and a description. A telephone cord and a pair of men’s briefs found on the bedroom floor were taken as evidence. The victim was taken to Charity Hospital for a sexual assault examination. Dejean testified that the victim stated that she was separated from her husband. She also informed the officer that the window through which the intruder entered had recently been repaired by the defendant. On May 9, the officer showed a photographic line-up to the victim, who selected the defendant’s picture and named him as the man who broke into her home and raped her.
Sergeant Lawrence Labry, custodian of 911 radio systems tapes, testified that he had a taped copy of the 911 call made by the victim on May 8, 1996. The tape was played for the jury.
D.L. testified that she lived at 4214 Darby Street, a shotgun double. She stated that an elderly woman lived in the other half of the house and a man lived in an apartment behind the house. One of D.L.’s four adult children lived with her on May 7, 1996; however, that son was in the hospital ,at that time. D.L. and her husband were separated. D.L. knew the defendant’s parents, who lived next door to her, and she knew defendant, who was staying a few doors down the street in property owned by his parents. Defendant had washed her car and assembled a television stand for her a few days prior to the incident at issue here.
D.L. testified that on May 7, 1996, she went to the hospital to visit her son and returned home to play cards. Later, she set a table up in her back yard, took the burners from her stove, set them on the table, and sprayed them in order to clean them. She watched television until about 10:00 p.m., then she went to bed. | /The front door was locked. D.L. woke up about an hour and a half later and went to the bathroom, then she returned to bed to sleep.
D.L. awoke later in the night realizing that something was on her back. She stated that she had been sleeping on her stomach and when she woke, she could not turn over and that the bed cover was over her head. D.L. tried to remove the cover, but someone put a cord around her neck and a pillow over her head. She said to her assailant, “Whoever it is, please leave. Please leave. I’m not going to say anything.” The person never spoke but continued to hold her down. During her struggle, D.L. had turned so that she was across the bed and she tried to kick over a small refrigerator that was on top of a nightstand. She did not succeed in knock *934 ing over the refrigerator, and in the ensuing struggle, she fell from the bed to the floor.
The assailant remained behind her holding the cord around her neck until D.L. became wedged between the bed and the closet. At that time she was on her back with the cover over her head and the cord still held tight around her neck. D.L. was wearing a long nightgown and panties. She testified that her panties were removed by the man who pinned her against the closet. When asked how the rape occurred, she said, “he actually penetrated my body.”
After the penetration, she felt his arms relax, and she said, “Whoever you is [sic], maybe you somebody that needs to be loved like me;” and the man answered, “Not if you know who it is.” She responded that she knew who it was because she had recognized his voice. D.L. testified “once ... I got him to answer, I just never stopped talking.” Defendant got up and sat on the side of the bed with his head down and said that no one understood him. D.L. testified that she was very frightened, but she was determined to calm him down so that he would leave her house without further harming her. He asked her for some water, and she went to |fithe kitchen for it. She returned with the water, and he remarked that she could have gotten a knife or gun. She testified that she thought about doing that but realized he could overpower her easily. After he drank the water, he walked into the next room where his pants were on the floor. He put them on and left by the back door.
As soon as he was gone, D.L. took the telephone into the bathroom, locked the door, turned on the water, and called the police. She said she was afraid he might hear her calling and return to kill her. She also called her brother and her son. The police arrived, and she told them who had broken into her house and raped her and she gave them his address. D.L. was taken to Charity Hospital for an examination. The next day she selected the defendant’s picture from a photographic line-up. She testified that she did not invite the defendant into her house that night and that he did not have permission to enter her house. Furthermore, she never consented to have sex with the defendant and she struggled to escape from him during the episode.
Under cross-examination, D.L. was asked if her husband had tried to break into her house. She answered that she let him into the house only when she was there and then only to eat and bathe. Shortly before this incident when she was staying at the hospital with a fatally ill son, her husband got into the house through a window. D.L. asked the defendant, who did repair work, to fix the window. She thought he had repaired it, but believed that he had entered through the same window.
Defendant, who lived at 4212 Darby Street, testified that he lived with his parents off and on since he got out of jail on November 28, 1995. He was working with his father and brother in May of 1996 doing cement and concrete work. |fiDefendant admitted having two prior convictions for burglary; however, he denied committing rape and claimed he had consensual sex with D.L. He testified that D.L. let him into her house that night just after midnight. He also claimed she “sell the stuff out of her house.” The defendant stated that D.L. talked to him about her personal problems with her husband who was alcoholic and who “messed with dope.” Defendant said that he witnessed D.L.’s husband breaking into her house about a week earlier because he had been sitting outside with his father on the night it happened. He said that on the night of the alleged rape, D.L. let him out of her house and he remained on the street near her house talking with people. When he saw the police arrive, he went to a house across the street because he was on parole and all the people on the street were “doped up.” He turned himself in days *935 later because he knew he had done nothing wrong.

ERRORS PATENT

An examination of the record reveals one error patent. Neither La. R.S. 14:60 nor La. R.S. 15:529.1, the two statutes under which defendant was sentenced, requires that the sentence be served without the benefit of parole. The defendant’s eligibility for parole should be left to the determination of the Department of Corrections in accordance with La. R.S. 15:574.4. The trial court erred in denying parole eligibility. State v. Henderson, 607 So.2d 725 (La.App. 4 Cir.1992); State v. Bell, 543 So.2d 965 (La.App. 4 Cir.1989). Accordingly, this Court amends the sentence to delete that portion of the fifteen-year sentence prohibiting parole eligibility.

JASSIGNMENT OF ERROR NO. 1 & PRO SE ASSIGNMENT OF ERROR NO. 1

By this assignment of error, defendant complains that the evidence was insufficient to support the aggravated rape conviction and the aggravated burglary conviction. He argues that the only evidence of a rape is the victim’s testimony and that her testimony is not credible.
The standard for reviewing a claim of insufficient evidence is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Rosiere, 488 So.2d 965 (La.1986). The reviewing court is to consider the record as a whole and not just the evidence most favorable to the prosecution; and if rational triers of fact could disagree as to the interpretation of the evidence, the rational decision to convict should be upheld. State v. Mussall, 523 So.2d 1305, 1310 (La.1988). Additionally, the reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence. Id.
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372, 378 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198, 1201 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817, 820 (La.1987).

AGGRAVATED RAPE

The pertinent elements of aggravated rape are: (1) sexual intercourse committed without the person’s lawful consent, where there is even the slightest penetration; and (2) the victim resists the act to the utmost, but her resistance is overcome by force. La. R.S. 14:42.
The defendant, through counsel, argues that the sex was consensual, noting the only evidence of rape is the victim’s statement. Furthermore, the defendant argues that D.L. claimed she struggled with the defendant, but she had no marks or bruises to indicate a fight, and her actions after the alleged rape were not consistent with those of a rape victim.
At trial, the victim described waking up with the realization that someone was on her back. She was choked by a cord around her neck and had bed covers and a pillow placed over her head. Detective Dejean noticed the telephone cord detached from the telephone and on the floor *936 when he investigated the scene. He found a pair of men’s briefs on the bedroom floor as well as the telephone. He described the bed as “messed up.” The victim testified that she continually pulled at the cord to keep it from choking her, and she tried to move her head to toss off the bed cover. The fact that she had no scars or bruises from the cord or from her fall from the bed does not exonerate defendant. The jury heard the victim’s 911 call, which had been taped and played at trial. The victim’s tone and statements could be ascertained from the tape.
| (/Defendant maintains that the facts to which the victim attests are incongruous. First, he notes that victim’s panties were not torn and argues that is an indication of consensual sex. Next, he points out that D.L. said she pleaded with him while a cord was around her neck and a cover was over her head. Defendant asserts that this is physically impossible.
D.L.’s clothing could have been roughly removed without being torn. Furthermore, a struggle to raise her head from the covers and speak when she could hold the cord away from her throat does not seem unreasonable.
Defendant further argues that his history with the victim indicates that consensual sex, not rape, occurred. He contends: (1) they both acknowledged they had known each other for several years; (2) he did odd jobs for her; (3) there is no evidence that defendant ever verbally threatened the victim. While these facts are true, none is convincing enough to prove per se consensual sex. Defendant also claims that the victim’s actions after the alleged rape were atypical, in that she spoke soothingly to him and brought him a glass of water, when she could have escaped from the house. The jury could reasonably have found that it was because D.L. knew the defendant and she realized she had to try to calm him to get him to leave without further harming her.
The testimony of the victim alone is sufficient to establish the elements of the offense of aggravated rape, even where the State does not introduce medical, scientific, or physical evidence to prove the commission of the offense by the defendant. State v. Lewis, 97-2854 (La.App. 4 Cir. 5/19/99), 736 So.2d 1004, 1023, writ denied, 99-2694 (La.3/17/00), 756 So.2d 325; State v. Johnson, 98-1017 (La.App. 5 Cir. 3/30/99), 735 So.2d 105, 108; State v. Ingram, 29,172, p. 10 (La.App. 2 Cir. 1/24/97), 688 So.2d 657, 664, writ denied, 97-0566 (La. 9/5/97), 700 So.2d 505. Furthermore, credibility determinations, as well as the weight to be attributed to the evidence, are soundly within the province of the jury’s trial function. State v. Brumfield, 93-2404, pp. 5-6 (La.App. 4 Cir. 6/15/94), 639 So.2d 312, 316. The determination of the weight of the evidence is a question of fact that rests with the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. State v. Silman, 95-0154, p. 12 (La.11/27/95), 663 So.2d 27, 35.
Considering all of the recorded evidence in this case, in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that defendant was the man who raped D.L. Physical evidence of sexual intercourse was found by the doctor who examined the victim and by the officer who investigated the incident. The jury heard the tape of the 911 call D.L. made immediately after the rape. Both the victim and the defendant testified, and the jury made a credibility determination of what occurred. On this record, this Court cannot say the evidence is not sufficient to support the conviction.

AGGRAVATED BURGLARY

Defendant next asserts that his conviction for aggravated burglary must fail because the evidence is insufficient to support his conviction for aggravated rape. Aggravated burglary, La. R.S. 14:60, is defined as:
*937 the unauthorized entering of any inhabited dwelling ... where a person is present, with the intent to commit a felony or any theft therein, if the offender, ... (3) Commits a battery upon any person while in such place....
Defendant argues that there is no evidence of an unauthorized entry. The victim denied giving defendant permission to enter the dwelling, notwithstanding Inthe defendant’s claim he was invited into the apartment. The investigating officer’s testimony that a table had been placed under a kitchen window, and the window had been opened, described physical evidence of an illegal entry. There was also testimony that the victim’s husband broke into the house through the same window a week prior to the rape, and the victim had asked the defendant to repair the window. The defense contends there was no broken glass to indicate a forced entry. However, the jury had a reasonable basis to conclude that the defendant committed an unauthorized entry.
Battery is defined as “the intentional use of force or violence upon the person of another.” La. R.S. 14:33. The State asserts that a battery occurred when the defendant was on top of the victim, smothered her with a pillow, wrapped a telephone cord around her neck, and had non-consensual intercourse with the victim. The jury reasonably believed the victim’s testimony that she did not give defendant permission to enter her home and she did not have consensual sex with him. Accordingly, the State proved that the defendant committed an aggravated burglary.
There is no merit to this assignment of error.

PRO SE ASSIGNMENT OF ERROR NO. 2

In his second pro se assignment of error, defendant complains that the trial court erred in overruling his objections to the testimony of Dr. Susanne White-Simms regarding the contents of the report prepared by another physician who performed the rape examination of the victim.
Dr. White-Simms, through stipulation by both the State and the defense, was qualified as an expert in the field of the examination and treatment of sexual abuse. 11gDr. White-Simms is a pediatrician at LSU Medical Center, specializing in rape forensics of children and adolescents. Dr. White-Simms testified that she has conducted thousands of rape examinations and that the rape forensics procedure is the same for adults as it is for children and adolescents.
Dr. White-Simms testified that the examination of the victim was performed by another physician. She testified that she examined the medical records of the victim and determined that the victim’s blood type was “B” and the person with whom D.L. had sexual intercourse was blood type “0”. Dr. White-Simms could not state an opinion whether or not the victim was raped, only that the victim had recently had sexual intercourse.
The trial court did not err in overruling defendant’s objection. La. C.E. art. 703 provides:
The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in a particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
Based upon La. C.E. art. 703, Dr. White-Simms, qualified as an expert in the field rape forensics, could testify on the basis of the medical examination performed by another physician. Dr. White-Simms’ testimony was limited to the interpretation of the data contained in the medical record. She could not testify as to her opinion as to whether or not the victim was raped.
This assignment of error is without merit.

*938
\uPRO SE ASSIGNMENT OF ERROR NO. 3

In his third and final pro se assignment of error, defendant complains that the trial court erred in admitting evidence of other crimes, namely two prior convictions for business burglary, that was elicited by defense counsel when defendant took the stand in his own defense. Defendant argues that there was no benefit to the defense in placing him on the witness stand and that the record is silent as to whether defendant was advised of his right to remain silent and how much harm he could cause to himself by taking the stand.
The trial court did not err in admitting into evidence defendant’s prior convictions, by way of defendant’s own testimony to which there was no objection. Defendant’s complaint appears to be more in the way of a claim of ineffective assistance of counsel in that he is essentially arguing that his attorney should not have let him testify so that the jury would not have learned that he had two prior convictions for burglary. The record is silent as to what defendant was advised prior to his taking the stand. This claim should be asserted in an application for post-conviction relief to be filed in the trial court where an evidentiary hearing can be held. State v. Prudholm, 446 So.2d 729, 737 (La.1984); State v. Sparrow, 612 So.2d 191, 199 (La.App. 4 Cir.1992).

^CONCLUSION

For the foregoing reasons, we affirm defendant’s convictions and his sentence for aggravated rape. Defendant’s sentence for aggravated burglary is amended to delete the denial of parole eligibility.

CONVICTION AFFIRMED; SENTENCE AMENDED.

. The defendant’s motion for a new trial was offered orally after sentencing on June 16, 1997. La.C.Cr.P. art. 873 requires a twenty-four hour delay between the overruling of a motion for a new trial or in arrest of judgment and sentencing. However, the trial court did not err by imposing sentence in this case because the defendant had not filed the motion in the record prior to sentencing.