Leon A. Cannizzaro, Jr., DISTRICT ATTORNEY, Donna Andrieu, Chief of Appeals, Kyle Daly, Assistant District Attorneys, Parish of Orleans, 619 South White Street, New Orleans, LA 70119, COUNSEL FOR STATE OF LOUISIANA
Mary Constance Hanes, LOUISIANA APPELLATE PROJECT, P. O. Box 4015, New Orleans, LA 70178-4015, COUNSEL FOR DEFENDANT
(Court composed of Judge Edwin A. Lombard, Judge Rosemary Ledet, Judge Paula A. Brown )
Judge Paula A. Brown *544 This is a criminal appeal. Defendant, Christopher Hutsell ("Mr. Hutsell"), seeks review of his conviction of second degree murder. For the reasons set forth below, we affirm Mr. Hutsell's conviction and sentence.
PROCEDURAL HISTORY
On June 25, 2015, Mr. Hutsell was indicted with one count of second degree murder and one count of obstruction of justice.[1] A jury trial on the charge of second degree murder commenced on November 9, 2015.[2] On November 17, 2015, the jury found Mr. Hutsell guilty of second degree murder, a violation of La. R.S.14:30.1.[3] On February 4, 2015, Mr. Hutsell was sentenced to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence.[4] This appeal follows.
FACTS
In March 2015, Mr. Hutsell and the victim, Julia Anderson ("Ms. Anderson"), had been in a romantic relationship for about twenty-one or twenty-two days. Both were part of a traveling community and were in New Orleans during this time period. On March 19, 2015, around 10:00 p.m., the couple, along with their three dogs, were in the parking lot of the McDonald's ("the McDonald's") located on Elysian Fields Avenue in New Orleans. Mr. Hutsell was fussing at Ms. Anderson and calling her names. As the argument escalated, Mr. Hutsell stabbed Ms. Anderson. Witnesses observed Mr. Hutsell exit the McDonald's parking lot on foot and proceed to Mardi Gras Truck Stop ("the Truck Stop") which was nearby. Mr. Hutsell was apprehended by police around twenty minutes later at the Carnival Club Casino and Sports Bar ("the Casino") located less than one mile from the McDonald's where Ms. Anderson was stabbed.[5] Ms. Anderson died as a result of the stab wound.
This matter was tried by a jury, and the testimony elicited at trial was as follows:
*545 EYEWITNESSES
Keith Robertson ("Mr. Robertson") testified that on March 19, 2015, he pulled into the parking lot of the McDonald's on Elysian Fields Avenue and parked.[6] From his car, he observed a Caucasian female sitting "Indian style" on the parking lot block and an African-American male standing up next to her. Mr. Robertson stated that the male and female were facing toward him when he first pulled up, and, as he continued to observe the couple, the male turned to the side. Mr. Robertson described the male as "black, hippie, dreaded," and he looked like a homeless person. He did not see any other "hippie-type people" around them. Mr. Robertson did not recall any facial tattoos but explained the male was dirty. Mr. Robertson recalled observing three dogs, a skateboard, and a Timberland boot near the couple.
Mr. Robertson testified he could tell by facial expressions that the man was "fussing" with the woman, but that the woman, as she sat on the curb, was not having a conversation with the male; she was responding "yes" or "no". Mr. Robertson testified as to what he witnessed in the following exchange with the State:
A. He [the African American male] go [sic] in his pocket, and what I figured, he, like-(making a quick hand motion)-punched in her neck, like with his fist.
Q. All right. So you saw him reaching into his pocket?
A. Yes.
Q. At that moment, did you see what he actually pulled out of his pocket?
A. No. I saw silver when he came back.
Q. All right. So he comes out of his pocket. What does he do when he comes out of his pocket?
A. Touched her neck.
Q. Okay. And was it hard?
A. No. It was just like a-like a push.
Q. Was it quick?
A. Quick.
Mr. Robertson continued and explained that the woman grabbed her neck, stood up, and tried walking towards Mr. Robertson, but she collapsed. The woman asked him for his help and said "[c]all the police." Mr. Robertson stated he was confused at first because he had not seen blood. As the woman spoke, she removed her hand from her neck and blood started coming out. After seeing the blood, Mr. Robertson called 9-1-1.
Mr. Robertson recalled the man who stabbed Ms. Anderson came to the side of his vehicle and tried to talk to him. Mr. Robertson told the man to "go ahead." Mr. Robertson continued that the man grabbed a dog, a skateboard, and a backpack and walked off. Mr. Robertson stated the man started walking toward the overpass on Elysian Fields Avenue. Mr. Robertson followed the man until the 9-1-1 operator told him to stop. Mr. Robertson then returned to the McDonald's.
Mr. Robertson spoke with the police after the officers arrived at the McDonald's. He was taken by the police to the Casino to identify a suspect that was apprehended. From the police car, Mr. Robertson identified the perpetrator. Mr. Robertson testified that there was no doubt in his mind that the person he identified was the person that stabbed the woman. In court, Mr. Robertson identified Mr. Hutsell as the perpetrator.
*546 Zerrick Warren ("Mr. Warren") testified that he was at the McDonald's the night of the stabbing. He was driving, and Toreion Angelleti ("Ms. Angelleti") was a passenger. There was a long line for the drive through that night. Mr. Warren recalled a man, who was later identified as Mr. Robertson, exited the McDonald's restaurant and asked him if he had seen what happened. Mr. Warren looked and saw the victim, a young Caucasian female, bleeding. He did not witness the victim get stabbed. To help stop the bleeding, Mr. Warren took off his shirt and gave it to Ms. Anderson. According to Mr. Warren, when he first noticed the victim, the perpetrator was standing a few inches from her and was calling her a "THOT." When the State asked him what he saw the defendant do on March 19, 2015, he responded, "I saw this guy leaving this young lady for dead, picking up his belongings, saying that she [sic] a THOT, she is a ho, and just walking off. And that's when I proceeded to get back in my car and follow him because I couldn't let this guy get away."
While Mr. Warren was trying to help the victim, he saw the perpetrator gathering his belongings located behind the victim. Mr. Warren recalled the perpetrator picked up a skateboard, retrieved a dog, and walked towards the Truck Stop located over the overpass or bridge. Mr. Warren returned to his car, where Ms. Angelleti was still a passenger, and followed the perpetrator. He drove to the Truck Stop and waited for the perpetrator, whom he could still see on the bridge. He explained the bridge was between the McDonald's and the Truck Stop, and the perpetrator was on the bridge for around five minutes. Mr. Warren testified he did not let the perpetrator out of his sight.
Mr. Warren testified that he identified Mr. Hutsell as the perpetrator that night. He explained that after he returned to the McDonald's to give his statement to the police, he went in a police vehicle to the Casino where Mr. Hutsell was being held. The officers asked if he saw the perpetrator, and Mr. Warren responded affirmatively. In court, Mr. Warren identified the perpetrator as Mr. Hutsell.
Ms. Angelleti testified that she was a passenger in Mr. Warren's vehicle when the couple went to the McDonald's on March 19, 2015. Ms. Angelleti stated that when they drove into the parking lot, she saw two people arguing-an African-American male and a Caucasian female. She described the male as wearing a hood or hat over his head with dreadlocks hanging out, rugged or torn clothing, and a jean jacket. Ms. Angelleti continued that she did not see a white male with dreadlocks around the couple. She recalled she rolled her window down, and she heard the male cursing and calling the woman "bitches, whore." Ms. Angelleti explained that when the male walked away from the woman, the woman was in "panic mode, holding her neck" and called for help. Ms. Angelleti testified that she did not witness the woman get stabbed. Ms. Angelleti stated that Mr. Warren exited the vehicle to give the victim his shirt while she stayed in the car.
Ms. Angelleti and Mr. Warren followed the perpetrator. She recalled the perpetrator had an army-type bag and a dog with him. Ms. Angelleti stated that the perpetrator exited the parking lot and walked onto the bridge on Elysian Fields Avenue. Ms. Angelleti was of the opinion the perpetrator was on the bridge for two to three minutes.
The last place Ms. Angelleti saw the perpetrator was at the Truck Stop. She testified that she was in a police vehicle when she was brought to the Truck Stop where she identified the perpetrator. In *547 court, Ms. Angelleti identified Mr. Hutsell as the perpetrator.
Brandy Johnson ("Ms. Johnson") was working at the McDonald's on March 19, 2015. Her shift was from 10:00 p.m. to 6:00 a.m. When she arrived for her 10:00 p.m. shift, she saw a man standing and a woman sitting down in the parking lot. Ms. Johnson stated the couple was talking or arguing; she could not hear them. She described the woman as a dirty-looking Caucasian with brown hair, and she recalled the woman had two dogs. She described the male as a dirty-looking Caucasian man with dreadlocks. Although Ms. Johnson testified that she told the police that the man was Caucasian, on cross-examination, she admitted that she could not tell the race of the man because he was dirty.
Ms. Johnson acknowledged the video from the surveillance camera at the McDonald's showed her exiting the restaurant into the parking lot around 11:19 p.m. At that time, Ms. Anderson had been stabbed, and Ms. Johnson checked on the victim. Ms. Johnson did not witness Ms. Anderson being stabbed.
VICTIM'S FAMILY AND FRIEND
Through the identification of one of the dogs that was with the victim the night of the stabbing, the police traced the victim's mother, Jannene Anderson ("Ms. J. Anderson"). Ms. J. Anderson identified the victim as her daughter, Ms. Anderson. Ms. J. Anderson lives in Michigan City, Indiana. She testified that the last time she saw her daughter was the day after Christmas or New Years in 2014. She acknowledged Ms. Anderson had a boyfriend name Gabriel ("Gabe") who traveled with her daughter. Ms. J. Anderson stated Gabe, whom she described as being of mixed nationalities, had dreadlocks. The last time she saw Gabe, however, at Thanksgiving 2014, less than four months before the victim was killed, his head was shaved, and he did not have dreadlocks.
Brook Songer testified that she had known Ms. Anderson for about five and a half years from being a part of the traveling community. She also knew Mr. Hutsell, who she called "Cosey," from the traveling community. Ms. Songer, Ms. Anderson, and Mr. Hutsell were in New Orleans in March 2015. Ms. Songer stated that Mr. Hutsell and Ms. Anderson were in a relationship for approximately twenty-one or twenty-two days before Ms. Anderson's death. During her testimony, Ms. Songer identified a picture of Ms. Anderson with Mr. Hutsell taken on March 12, 2015, in the French Quarter.[7] Ms. Songer testified that a few days before March 12, 2015, Mr. Hutsell punched Ms. Anderson in the eye and gave her a "busted lip." Ms. Songer stated Mr. Hutsell frequently screamed at Ms. Anderson. Ms. Songer recalled whenever she saw the couple in the French Quarter, Mr. Hutsell would have a "tight rein" on Ms. Anderson, he would yell at her, and he would "pull her and then jerk her."[8]
Ms. Songer testified she knew Gabe through Ms. Anderson, and that she last saw him at the beginning of February 2015. She recalled, at that time, Gabe's head was shaved. Ms. Songer further stated that Gabe was in Florida on March 19 and 20 of 2015.
*548 9-1-1 CALLS AND OFFICERS
The first call came into 9-1-1 at 11:20 p.m., and an incident was created at 11:22 p.m.[9] In the 9-1-1 call, Mr. Robertson described the perpetrator as a homeless male, dressed like a hippie, with a pit bull dog, walking down the Elysian Fields Avenue overpass. In addition to Mr. Robertson, others at the scene called 9-1-1 to report the incident. The callers gave similar descriptions of the perpetrator as Mr. Robertson: (1) the perpetrator appeared homeless with dreads; (2) he was wearing a black shirt with gray pants, and had a gray pit bull; (3) the man and dog were walking down Elysian Fields Avenue over the bridge; (4) a possible homeless African-American male with something dark on his head, walking a dog down Elysian Fields Avenue toward the Truck Stop; and (5) an African-American male wearing black clothing, with "dreads," a backpack, carrying a skateboard, and he had a pit bull dog.
Detective James testified he was called to the scene on the night Ms. Anderson was stabbed. He stated the first call reporting the stabbing was received at around 11:22 p.m., and he arrived at the McDonald's around 11:32 p.m. After speaking to the witnesses at the scene, he drove one of the witnesses, Antoinette Jones ("Ms. Jones"), over the Elysian Fields' bridge toward the Casino and Truck Stop.[10] He recalled he was in his unmarked vehicle. Detective James testified when he pulled into the front of the Truck Stop, Ms. Jones identified the perpetrator.[11] Detective James testified he immediately exited his vehicle, pulled out his gun, ordered Mr. Hutsell to the ground, and handcuffed him. A backpack was recovered from Mr. Hutsell. Detective James estimated Mr. Hutsell was apprehended around twenty minutes after the victim was stabbed.
Detective Tanisha Sykes ("Detective Sykes") was the lead homicide detective assigned to investigate Ms. Anderson's death.[12] Detective Sykes arrived at the McDonald's within one or two hours after Ms. Anderson was stabbed. The testimony of Detective Sykes reflected Ms. Anderson was stabbed between 11:17 p.m. and 11:22 p.m. on March 19, 2015.
Detective Sykes identified witnesses at the crime scene, and these witnesses provided descriptions of the perpetrator. Also, the witnesses informed the officers the perpetrator left the McDonald's and went to the Truck Stop. Detective Gus James of the New Orleans Police Department apprehended the suspect at the Casino. Detective Sykes testified that Mr. Hutsell was identified as the perpetrator by three witnesses that participated in a show-up identification procedure conducted at the Casino.[13] Detective Sykes indicated that the Casino was less than a mile from the McDonald's and estimated it would take a *549 person about ten minutes to walk from the McDonald's to the Casino.
Detective Sykes stated that the McDonald's video surveillance camera, which was focused on the area where the victim was stabbed, was inoperable. However, another surveillance camera at the McDonald's was working. The video showed an unknown male giving the victim money around 11:03 p.m. The detective testified that another surveillance camera at the McDonald's showed-after the victim was stabbed around 11:17 or 11:18 p.m.-the perpetrator, with a dog, walk halfway through the parking lot and throw a Timberland boot into the driveway.[14] The surveillance video also showed the perpetrator leaving the parking lot and walking toward Elysian Fields Avenue.
Video surveillance from the Truck Stop verified the perpetrator went into the convenience store. Detective Sykes testified that video surveillance footage from the Truck Stop showed a subject, with a dog, walking from the direction of the crime scene to the Truck Stop. The time stamp of the footage was 11:28 p.m., March 19, 2015. Detective Sykes stated that the next portion of the footage showed the subject, who was wearing a black hat and had dreadlocks, enter the store and exit the cooler with a beer. According to the detective, the footage showed the subject leaving the Truck Stop at 11:30 p.m. and walking with a dog in the direction of the Casino.[15]
Detective Sykes identified numerous photographs taken of the crime scene by the crime lab.[16] The photos depicted an Ozarka water jug and a left Timberland boot recovered from the McDonald's which were submitted for DNA testing. The photos taken at the Casino, after Mr. Hutsell was apprehended, depicted an army-green backpack, a skateboard, a dog. and a black piece of material.[17] Detective Sykes stated that these items were consistent with the descriptions of items provided by the witnesses.
Photos, taken at the time of Mr. Hutsell's apprehension, depicted Mr. Hutsell with facial tattoos, dreadlocks, and wearing a black t-shirt with a picture of the Three-Stooges on it and a dirty, dark "green-ish blue jean vest" with silver spikes on the front of it. Detective Sykes noted that Mr. Hutsell's clothing and hairstyle were consistent with the descriptions provided by the witnesses. Detective Sykes admitted none of the witnesses stated the suspect had facial tattoos.
As part of her investigation, Detective Sykes searched the area between the McDonald's and the Truck Stop: the overpass, below the overpass, the railroad tracks, and the area on both sides of the canal. A weapon was not found. Defendant Sykes noted that Mr. Hutsell had no blood on his clothes and no visible wounds or blood on his hand. Additionally, a pocket knife recovered from Mr. Hutsell was determined not to be the murder weapon.
Detective Sykes testified that the victim was taken to the hospital where she died as a result of the bleeding from the stab wound ; and, there was information received that the victim did not stab herself. Detective Sykes testified that the victim *550 was identified as Ms. Anderson through one of the dogs found at the crime scene.[18]
STATE'S EXPERTS
Dr. Samantha Huber ("Dr. Huber"), who conducted the autopsy on Ms. Anderson, testified as an expert in the field of forensic pathology. Dr. Huber opined that Ms. Anderson sustained a single stab wound that went behind the clavicle and the first rib damaging the subclavian vessels (an artery and a vein). The entry wound went from the front to the back with a somewhat downward trajectory. Ms. Anderson died as a result of the bleeding from the wound.
Elizabeth Hamilton ("Ms. Hamilton") testified she worked at the Louisiana State Police Crime Laboratory as a DNA forensic analyst. Ms. Hamilton conducted a DNA analysis of the mouth of the Ozarka water jug which was recovered from the crime scene. Ms. Hamilton testified that the analysis of the water jug was consistent with being a mixture of DNA from Mr. Hutsell, Ms. Anderson, and a third unknown person. Ms. Hamilton explained the two most "statistically significant DNA samples present" on the water jug were from Mr. Hutsell and Ms. Anderson. Additionally, Ms. Hamilton conducted a DNA analysis of the left Timberland boot recovered from the parking lot of the McDonald's. The analysis indicated Mr. Hutsell could not be excluded as a contributor, and Ms. Hamilton affirmed she could say with a reasonable degree of scientific certainty that Mr. Hutsell's DNA was on the Timberland boot. Ms. Hamilton acknowledged the victim's DNA was not found on Mr. Hutsell's hands.
Dr. Mark Perlin, employed by Cyber Genetics-a company located in Pittsburg, Pennsylvania-was accepted as an expert in DNA evidence interpretation and the likelihood ratio. He testified DNA testing indicated the DNA of Mr. Hutsell and Ms. Anderson were on the handle of the Ozarka water jug found at the scene of the offense, along with a very small amount of DNA attributed from a third unknown source.
DEFENSE'S WITNESS
Joshua Pichon, an investigator for the Orleans Public Defender's Office, testified that he timed how long it would take a person to walk from the McDonald's to the Truck Stop without stopping, as part of the investigation. He concluded it would take eleven minutes and thirteen seconds. Mr. Pichon testified that the stabbing occurred at 11:19 p.m., and in his opinion, the earliest Mr. Hutsell could have gotten to the Truck Stop was a little after 11:30 p.m.
ERRORS PATENT
A review of the record for errors patent on the face of the record reveals one error. See La. C.Cr.P. art. 920. The district court erred in sentencing Mr. Hutsell immediately after denying his motion for new trial and before imposing sentence without abiding by the mandatory delay required by La. C.Cr.P. art. 873.[19] An explicit waiver of the delay is required.
*551 State v. Kisack , 16-0797, pp. 6-7 (La. 10/18/17), 236 So.3d 1201. Nevertheless, the error is subject to the harmless error analysis. Id. "Absent a showing that prejudice resulted from the failure to afford the statutory delay, reversal of the prematurely imposed sentence is not required." State v. Seals, 95-0305, p. 17 (La. 11/25/96), 684 So.2d 368, 380 (citing State v. White, 404 So.2d 1202 (La.1981). In the case sub judice , Mr. Hutsell was convicted of second degree murder which carries a mandatory sentence of life imprisonment without benefit of parole, probation, or suspension of sentence; thus, we find the error is harmless.
DISCUSSION
Mr. Hutsell assigns four errors, and we will address each assignment of error separately.
ASSIGNMENT OF ERROR NO. 1: INSUFFICIENT EVIDENCE
Mr. Hutsell challenges the sufficiency of the evidence to convict him of second degree murder.
When issues are raised on appeal as to the sufficiency of the evidence, and as to one or more trial errors, the reviewing court must first determine the sufficiency of the evidence. State v. George , 15-1189, p. 9 (La. App. 4 Cir. 11/9/16), 204 So.3d 704, 711 (quoting State v. Marcantel , 00-1629, p. 8 (La. 4/3/02), 815 So.2d 50, 55 ). This Court, in State v. Hickman , 15-0817, p. 9 (La. App. 4 Cir. 5/16/16), 194 So.3d 1160, 1165-66 (quoting State v. Brown , 03-0897, p. 22 (La. 4/12/05), 907 So.2d 1, 18 ), set forth the standard for determining a claim of insufficiency of the evidence as follows:
When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard enunciated in Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard, the appellate court "must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." State v. Neal , [20]00-0674 (La. 6/29/01), 796 So.2d 649, 657 (citing State v. Captville , 448 So.2d 676, 678 (La. 1984) ).
When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 requires that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence."
Neal , 796 So.2d at 657. Ultimately, all evidence, both direct and circumstantial must be sufficient under Jackson to prove guilt beyond a reasonable doubt to a rational jury. Id. (citing State v. Rosiere , 488 So.2d 965, 968 (La. 1986) ).
"[W]hen circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience." State v. Egana , 97-0318, p. 6 (La. App. 4 Cir. 12/3/97), 703 So.2d 223, 228 (citing State v. Shapiro , 431 So.2d 372 (La. 1982) ). Whether circumstantial evidence excludes every reasonable hypothesis of innocence presents a question of law. Shapiro , 431 So.2d at 384 (citations omitted).
Additionally, "[i]f rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all of the evidence most favorable to the prosecution must be adopted." State v. Green , 588 So.2d 757, 758 (La. App. 4 Cir. 1991) (citation omitted). It is not the function of the appellate court to assess the credibility *552 of witnesses or reweigh the evidence and credibility determinations; the weight attributed to the evidence is soundly within the province of the fact finder. State v. Scott , 12-1603, p. 11 (La. App. 4 Cir. 12/23/13), 131 So.3d 501, 508 (citing State v. Johnson , 619 So.2d 1102, 1109 (La. App. 4 Cir. 1993) and State v. Brumfield , 93-2404 (La. App. 4 Cir. 6/15/94), 639 So.2d 312, 316 ). Therefore, "[c]onflicting testimony as to factual matters is a question of weight of the evidence, not sufficiency." State v. Jones , 537 So.2d 1244, 1249 (La. App. 4 Cir. 1989). Moreover, "[a]bsent internal contradiction or irreconcilable conflict with physical evidence, a single eyewitness' testimony, if believed by the fact finder, is sufficient to support a factual conclusion." State v. Marshall , 04-3139, p. 9 (La. 11/29/06), 943 So.2d 362, 369 (citation omitted).
In the case sub judice , the State had the burden to prove (1) the killing of a human being; (2) with specific intent to kill; and (3) that Mr. Hutsell was the perpetrator. La. R.S. 14:30.1 ; State v. Scott , 15-0778, pp. 9-10 (La. App. 4 Cir. 6/29/16), 197 So.3d 298, 304-05, writ denied , 16-1542 (La. 6/5/17), 219 So.3d 339.[20] The testimony and evidence adduced at trial indicates the perpetrator stabbed Ms. Anderson and left her to die. Mr. Hutsell does not contest these elements. Accordingly, applying the Jackson standard, we find the State proved beyond a reasonable doubt the first two elements of second degree murder.
Mr. Hutsell does, however, contest the reliability of the identification process. " 'Where the key issue is identification, the state is required to negate any reasonable probability of misidentification in order to carry its burden of proof.' " Scott , 15-0778, p. 10, 197 So.3d at 305 (quoting State v. White, 14-0397, pp. 18-19, 174 So.3d 177 at 189.) Although Mr. Hutsell admitted he was bickering with Ms. Anderson at the McDonald's, he insists that he left before Ms. Anderson was stabbed, and that a white male with dreadlocks-who also knew Ms. Anderson-was the person who stabbed her.[21] Mr. Hutsell contends the State failed to prove he was the perpetrator, alleging that: (1) the identification procedure used by police was unreliable; (2) the eyewitness testimonies were unreliable; (3) there was no physical evidence to link him to the stabbing, and (4) the State failed to negate any reasonable probability of misidentification-that someone other than him stabbed Ms. Anderson.
IDENTIFICATION PROCEDURE
Mr. Hutsell challenges the identification process utilized by the three witnesses-Mr. Robertson, Mr. Warren, and Ms. Angelleti-asserting that it was never tested in a physical or photographic lineup, but rather a show-up identification was conducted. Detective Sykes, Detective Guy, and the three witnesses testified that the witnesses went in a police vehicle to the Casino where Mr. Hutsell was being held *553 shortly after the victim was stabbed. Mr. Hutsell stood in front of the police car, and a light was shone on him.
In State v. Lambert , 15-0629 (La. App. 4 Cir. 3/16/16), 191 So.3d 630, writ denied , 16-0681 (La. 4/7/17), 218 So.3d 109, the defendant asserted that the State failed to prove beyond a reasonable doubt that he was the individual who committed the robbery and argued that the lack of reliable identification evidence led to the jury's irrational decision. As in this case, the show-up identification procedure was used by the police. This Court set forth the applicable law for a one-on-one identification procedure, such as the show-up identification, writing in pertinent part:
One-on-one identifications are generally not favored, although such identification procedures are permissible when justified by the circumstances. State v. Briley , 13-1421, p. 16 (La. App. 4 Cir. 10/1/14), 151 So.3d 633, 643 ; State v. Nelson , 08-0584, p. 5 (La. App. 4 Cir. 12/17/08), 3 So.3d 57, 60. One-on-one identifications are permissible when the accused is apprehended within a relatively short period of time after the occurrence of the crime and is returned to the scene for immediate identification. Briley , 13-1421, p. 16, 151 So.3d at 643-644 ; State v. Robinson , 09-0922, p. 2 (La. App. 4 Cir. 3/10/10), 50 So.3d 158, 160. Immediate confrontation assures the reliability of the identification (given that the perpetrator's appearance is fresh in the witness's mind), lessens the possibility that the perpetrator's
clothes or appearance will be changed, and insures early release of innocent subjects. Nelson , 08-0584, pp. 5-6, 3 So.3d at 61.
Lambert , 15-0629, pp. 9-10, 191 So.3d at 637. In Lambert , in assessing the reliability of eyewitness identification, this Court looked to the five factors set forth by the United States Supreme Court in Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). This Court explained the Manson factors "are applied to determine whether an identification made under suggestive circumstances arranged by the police created a 'substantial likelihood of misidentification.' " Id. , 15-0629, p. 9, 191 So.3d at 637 (quoting Perry v. New Hampshire, 565 U.S. 228, 132 S.Ct. 716, 724-726, 181 L.Ed.2d 694 (2012) ). Additionally, in State v. Davenport , 16-0223, p. 7 (La. App. 4 Cir. 10/18/17), --- So.3d ----, ----, 2017 WL 4700652, *7 (citing State v. Santos-Castro , 12-0568, p. 22 (La. App. 4 Cir. 7/31/13), 120 So.3d 933, 946-47 ), this Court employed the five Manson criteria to assist in assessing the reliability of eyewitness identifications when the issue was raised that the State failed to negate any reasonable probability of misidentification of the defendant. The five Manson factors are as follows: (1) the witness' opportunity to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of his prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and the confrontation. Id. , 432 U.S. at 114-15, 97 S.Ct. 2243.
In the case sub judice , all three witnesses were only a few feet from Mr. Hutsell when they observed him, and they did not see anyone else around Mr. Hutsell and Ms. Anderson. The witnesses were acutely interested in Mr. Hutsell and his actions and noticed his actions soon after they arrived at the McDonald's. All three witnesses followed Mr. Hutsell for a significant distance and had the opportunity to scrutinize his appearance. The descriptions provided by the witnesses of the distinctive appearance of the perpetrator were extremely accurate and matched Mr. Hutsell. The witnesses provided the police with an accurate and detailed description of Mr. *554 Hutsell's possessions-a large backpack, a skateboard, and a dog. These possessions were recovered when Mr. Hutsell was apprehended. The witnesses' descriptions were buttressed by the surveillance video which placed Mr. Hutsell at the exact location at the time reported by the witnesses. Finally, Mr. Hutsell was apprehended shortly after the witnesses relayed his location to police, and their identifications took place within a diminutive time frame of his apprehension.
Accordingly, we find there was sufficient evidence for the jury to conclude Mr. Hutsell was the perpetrator.
RELIABILITY OF THE WITNESSES' TESTIMONY
Mr. Hutsell questions Mr. Robertson's reliability as a witness urging that: (1) Mr. Robertson did not see a knife or other weapon, only a silver object in the perpetrator's hand as he pulled back from the victim's neck; (2) at first, Mr. Robertson did not think that Ms. Anderson was hurt by the man's actions; (3) the subsequent actions of the man, in walking towards Mr. Robertson and trying to explain himself, made no sense if he had just stabbed the woman; and (4) Mr. Robertson was too shocked to have understood what happened.
Review of the record reflects that moments before Ms. Anderson was stabbed in the neck, Mr. Robertson observed Mr. Hutsell fussing at Ms. Anderson while Mr. Hutsell stood over her. This testimony was corroborated by Mr. Warren, and Ms. Angelleti. Mr. Robertson observed Mr. Hutsell reach into his pocket, remove his hand, and poke or push Ms. Anderson's neck with a quick hand motion. As Mr. Hutsell withdrew his hand, Mr. Robertson saw that Mr. Hutsell was holding something silver. In the moments that followed, Mr. Robertson watched as Ms. Anderson grabbed her neck, blood began coming from the wound, and she asked him for help. Mr. Warren and Ms. Angelleti corroborated Mr. Robertson's testimony. No rational juror could have concluded anything other than Mr. Robertson saw Mr. Hutsell stab Ms. Anderson. Additionally, Mr. Robertson immediately accused Mr. Hutsell of stabbing Ms. Anderson, followed him out of the parking lot, and called 9-1-1, clearly demonstrating that he was not too shocked to have understood what happened.
Mr. Hutsell discounts the testimony of Mr. Warren and Ms. Angelleti on the basis that neither witness had their eyes on Ms. Anderson at the exact moment she was stabbed. Although neither witness actually witnessed the stabbing, both noticed Mr. Hutsell yelling and calling Ms. Anderson names. Ms. Angelleti's testimony reflects that Mr. Hutsell's actions toward Ms. Anderson were so pronounced that she rolled her window down so that she could hear what was being said. Further, the couple followed Mr. Hutsell as he left the McDonald's parking lot, stopped on the overpass, and continue to the Truck Stop. This testimony was corroborated by Mr. Robertson, the video surveillance, and Mr. Hutsell being apprehended less than one mile from the crime scene at the Casino near the Truck Stop.
Mr. Hutsell further challenges the reliability of the three witnesses' identification because these witnesses did not mention his facial tattoos. Notwithstanding, the jurors were able to weigh that omission against the totality of the evidence presented by the State.[22]
*555 We find the jury's credibility assessment in this case is not clearly contrary to the evidence presented.
PHYSICAL EVIDENCE
Mr. Hutsell argues there was no physical evidence to link him to the stabbing. In support, he points out that when he was apprehended, the murder weapon was not in his possession, and it was never found. Mr. Hutsell highlights there were no visible traces of blood on his clothes when he was arrested just minutes after the incident. Mr. Hutsell notes that Detective Sykes testified they searched the area between the homicide and his arrest location and did not discover any bloody clothes or weapons.
In State v. Marshall , 99-2176, p. 12 (La. App. 4 Cir. 8/30/00), 774 So.2d 244, 252 (citing State v. Jones , 97-2591, p. 7 (La. App. 4 Cir. 9/8/99), 744 So.2d 165, 169 ), this Court declared if there is no physical evidence to link a defendant to a crime, "the testimony of one witness, if believed by the trier of fact, is sufficient support for a requisite factual conclusion" and the "jury's credibility decision should not be disturbed unless it is clearly contrary to the evidence presented."
In the case sub judice , Mr. Robertson testified he witnessed Mr. Hutsell stab Ms. Anderson, and the jury believed Mr. Robertson. There was no countervailing evidence presented that would disturb the jury's credibility finding. In fact, the circumstantial evidence presented overwhelmingly supports Mr. Robertson's testimony.
Again, we find the jury's credibility assessment in this case is not clearly contrary to the evidence presented.
STATE FAILED TO NEGATE ANY REASONABLE PROBABILITY OF MISIDENTIFICATION
Mr. Hutsell espouses that although he was at the McDonald's with Ms. Anderson the night of the stabbing, Ms. Anderson was stabbed by a white male after he left. Mr. Hutsell points out that Ms. Johnson testified a white male with dreadlocks stabbed Ms. Anderson. However, Ms. Johnson admitted on cross-examination she was unsure of the perpetrator's race.
Additionally, Mr. Hutsell's theory was negated by the State. Mr. Robertson, Mr. Warren, and Mrs. Angelleti testified there was not a third person around the couple. Ms. J. Anderson (Ms. Anderson's mother) testified her daughter had a former boyfriend named Gabe, who is of mixed nationalities with dreadlocks, that was part of the traveling community. However, Ms. J. Anderson stated that Gabe had a shaved head when she saw him four months before her daughter was killed. Furthermore, Ms. Songer testified Gabe was in Florida at the time of the stabbing, and this testimony was uncontested.
In further support, Mr. Hutsell argues the time that appears on the surveillance video from the Truck Stop corroborates his conjecture that someone else stabbed Ms. Anderson. The evidence presented at trial indicated the stabbing occurred between 11:17 p.m. to 11:22 p.m., when it was reported. Although the evidence of the time of the stabbing varied by minutes, the jurors were able to weigh that against all of the evidence and had a rational basis for rejecting Mr. Hutsell's theory-that in the midst of the argument between Mr. Hutsell and Ms. Anderson another person stabbed Ms. Anderson.
Applying the Jackson standard-viewing the evidence in the light most favorable to the State-we find the evidence was sufficient to show the State negated any reasonable likelihood of misidentification, excluded every reasonable explanation of innocence, and proved beyond a *556 reasonable doubt that Mr. Hutsell stabbed and killed Ms. Anderson.
This assignment error lacks merit.
ASSIGNMENT OF ERROR NO. 2: SPECIAL JURY INSTRUCTION
Mr. Hutsell complains the district court abused its discretion in refusing to give a special jury charge regarding eyewitness identification testimony.[23] Mr. Hutsell, citing La. C.Cr.P. art. 803, contends the district court was required to charge the jury as to the law applicable to the case.[24] He asserts the failure of the district court to give the requested jury instruction deprived him of his constitutional right to a fair trial. Mr. Hutsell further argues since the special charge was not given, there was an implied ruling by the district court which was properly raised in his motion for new trial.
The State asserts Mr. Hutsell's alleged error is not properly before this court because it was waived when Mr. Hutsell did not re-urge the special jury charge, and because there was no ruling by the district court. We agree.
Louisiana Code of Criminal Procedure Article 841provides in part:
A. An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. A bill of exceptions to rulings or orders is unnecessary. It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefor.
B. The requirement of an objection shall not apply to the court's ruling on any written motion.
On November 9, 2015, prior to commencement of the trial, the defense stated, "Your Honor, I did file a Motion for special jury instructions and Motions for written jury instructions. And Your Honor, I believe we can address that at the appropriate time-if the State agrees." The district court responded, "Indeed [;]" and, the State responded, "That's fine."
The record evidence does not indicate Mr. Hutsell obtained a ruling on the written motion.[25] Additionally, Mr. Hutsell *557 failed to re-urged the special jury charge regarding eyewitness identification testimony, and he failed to object to the jury charge. Further, Mr. Hutsell does not allege he re-urged the instruction or objected to the instruction, except after his conviction, in his motion for new trial.[26] It was incumbent on Mr. Hutsell to re-urge the request for the special charge and to object to the jury charge before or directly after the charges were read to the jury by the district court. Defendant's objection in the motion for new trial was too late. In State v. Fink , 255 La. 385, 396, 231 So.2d 360, 365 (1970), the court explained:
Such an objection [failure of the judge to give a special charge] must be made at the time the general charge is given, so that the trial judge will have an opportunity to change, explain, or correct the charge. When raised for the first time in a motion for a new trial, the objection comes too late. LSA-C.Cr.P. Art. 841 ; State v. Washington , 225 La. 1021, 74 So.2d 200 ; State v. Hill , 122 La. 711, 48 So. 160.
We find Mr. Hutsell failed to properly preserve this issue for review on appeal; thus, this assignment of error is denied.[27]
ASSIGNMENT OF ERROR NO. 3: MISTRIAL
Mr. Hutsell asserts the district court abused its discretion in denying his motion for a mistrial, pursuant to La. C.Cr.P. art. 771, when the State elicited other bad acts evidence from Ms. Songer.
During cross-examination, defense counsel asked Ms. Songer, "You can't say whether anybody had the intent to hurt her [Ms. Anderson] prior to March 19, 2015, correct?" and Ms. Songer responded, "No, Sir."
On redirect, the State questioned Ms. Songer further, "Based on the defense attorney's last question, I will ask you the question: Did you know ... or have reason to believe that anybody did or had intended harm to Zoey [Ms. Anderson]." Ms. Songer responded, "Yes, sir." The State inquired who intended to harm Ms. Anderson. The defense objected on the basis that the response concerned other crimes/bad acts by Mr. Hutsell under Prieur , and Mr. Hutsell was not given notice that the State would use these bad acts against him at trial.[28] The district court overruled the objection, and Ms. Songer responded to the State's question, "Cosey [Mr. Hutsell]."
Ms. Songer continued and explained a few days before the March 12, 2015 picture of Ms. Songer, Mr. Hutsell, and Ms. Anderson was taken, Mr. Hutsell punched Ms. Anderson in the eye and busted her lip. Ms. Anderson told her she wanted to *558 get away from Mr. Hutsell. The defense objected on the basis of hearsay and the objection was sustained. Following, Ms. Songer further testified she saw Mr. Hutsell grab Ms. Anderson's arm and jerked her when she tried to walk away. She described Mr. Hutsell having a "tight rein on her [Ms. Anderson]."
On the next day of the trial, the defense moved for a mistrial on the following grounds: (1) the questioning by the State was outside of the scope of the question asked by the defense on cross-examination; (2) there was no foundation for the State's questioning; and (3) the State presented other bad acts evidence but Mr. Hutsell received no Prieur notice. Specifically, the defense stated that "based upon the speculative nature of that testimony under [article] 403 and based on Prieur and 404(B), we are moving for a mistrial."[29] The State responded the defense opened the door when it questioned Ms. Songer if anyone intended to harm Ms. Anderson, and the defense did not allow Ms. Songer to explain her answer. The district court denied the motion, and the defense objected.
On appeal, Mr. Hutsell asserts the district court abused its discretion in failing to grant the mistrial. Mr. Hutsell urges the defense did not open the door to the questioning by the State, and the improper questions by the State prejudiced him. Again, the State counters that the defense opened the door to the questioning of Ms. Songer on redirect, and even assuming the testimony should not have been admitted, any error is harmless in light of evidence in support of Mr. Hutsell's guilt.
Louisiana Code Criminal Procedure Article 771 provides in pertinent part:
In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
* * *
(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
This Court, in State v. Finch , 97-2060, pp. 9-10 (La. App. 4 Cir. 2/24/99), 730 So.2d 1020, 1025-26, set forth the applicable law on this issue and opined:
When a witness refers directly or indirectly to another crime committed or alleged to have been committed by the defendant, as to which evidence is not admissible, the defendant's remedy is a request for an admonition or a mistrial pursuant to La.C.Cr.P. art. 771. The remark or comment must constitute an unambiguous reference to other crimes. State v. Lewis , 95-0769, p. 7 (La.App. 4 Cir. 1/10/97), 687 So.2d 1056, 1060, writ denied , 97-0328 (La. 6/30/97), 696 So.2d 1004. On request, the trial court shall *559 admonish the jury to disregard such remark or comment. La.C.Cr.P. art. 771. Upon motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant of a fair trial. Id. The granting of a mistrial under La.C.Cr.P. art. 771 is at the discretion of the trial court and should be granted only where the prejudicial remarks of the witness make it impossible for the defendant to obtain a fair trial. State v. Smith , 418 So.2d 515, 522 (La.1982) ; State v. Allen, 94-1895, p. 9 (La. App. 4 Cir. 9/15/95), 661 So.2d 1078, 1085, writs denied , 95-2557, 95-2475, (La. 2/2/96), 666 So.2d 1087. Mistrial is a drastic remedy which is only authorized where substantial prejudice will otherwise result to the defendant. Id. The determination of whether prejudice has resulted lies within the sound discretion of the trial court. State v. Banks , 96-2227, p. 2 (La. 4/18/97), 692 So.2d 1051, 1053. A trial court's ruling on whether or not to grant a mistrial because of comment ... referring to other crimes evidence should not be disturbed absent a clear abuse of discretion. State v. Nicholson , 96-2110, p. 13 (La. App. 4 Cir. 11/26/97), 703 So.2d 173, 180, writ denied , 98-0014 (La. 5/1/98), 805 So.2d 200 ; State v. Manuel , 94-0087, 94-0088, p. 4 (La. App. 4 Cir. 11/30/94), 646 So.2d 489, 491. "Errors are harmless unless the reviewing court is thoroughly convinced that the remarks inflamed the jury and contributed to the verdict." State v. Nicholson , supra , citing State v. Byrne , 483 So.2d 564 (La.1986), cert. denied , Byrne v. Louisiana, 479 U.S. 871, 107 S.Ct. 243, 93 L.Ed.2d 168 (1986).
In State v. Ingram , 29,172, p. 17 (La. App. 2 Cir. 1/24/97), 688 So.2d 657, 667 (citing State v. Joseph , 437 So.2d 280, 283 (La. 1983) ; State v. Williams , 26,655, p. 5 (La. App. 2 Cir. 3/1/95), 651 So.2d 331, 334 ), the appellate court opined that "[a] witness's voluntary, unresponsive testimony which implicates a defendant in other crimes does not require a mistrial, at least where the form of the prosecutor's question does not indicate bad faith."
We find the testimony by Ms. Songer was not an irrelevant or immaterial remark or comment, nor was it unresponsive to the State's questioning. Moreover, we do not find the State acted in bad faith in asking the question. Instead, Ms. Songer's testimony on redirect examination was responsive to the State's question which was asked in direct response to the defense counsel's question. The Ingram court explained that it was within the trial court's discretion as to what matters are subject to redirect examination and espoused in pertinent part:
A witness who has been cross-examined is subject to redirect examination as to matters covered on cross-examination and, in the discretion of the court, as to other matters in the case. La. C.E. art. 611 D; see State v. Wiley , 614 So.2d 862, 871 (La. App. 2d Cir.1993). A trial court's ruling allowing exploration of such matters on redirect will not be disturbed on appeal absent an abuse of the trial court's "broad discretion." State v. Robinson , 624 So.2d 1260, 1264 (La.App. 2d Cir.1993), writ denied , 93-2899 (La. 2/11/94), 634 So.2d 372.
Ingram , 29-172, pp. 18-19, 688 So.2d at 668.
Our review of the record fails to show the district court abused its discretion in allowing the State to further explore the veracity of Ms. Songer's testimony on redirect examination.
As to Mr. Hutsell's assertion that he was prejudiced by the improper questions by the State as to warrant a mistrial, we find that Mr. Hutsell fails to prove Ms. Songer's *560 testimony unduly prejudiced him. As noted above, the district court sustained the defense's objection to the alleged hearsay testimony by Ms. Songer.
This Court, in State v. Johnson , 17-0717, p. 3 (La. App. 4 Cir. 8/27/17), 226 So.3d 1178, 1180, noted a grant of a mistrial pursuant to article 771 is discretionary. Accordingly, we find the record supports the district court did not abuse its discretion in denying Mr. Hutsell's request for a mistrial.[30]
Notwithstanding, even assuming the district court erred in allowing the testimony, which we conclude it did not, the admission of other bad acts evidence would be subject to a harmless error analysis. La. C.Cr.P. art. 921 ; State v. Johnson, 94-1379, pp. 14-15 (La. 11/27/95), 664 So.2d 94, 100-01 ; Finch , 97-2060, p. 10, 730 So.2d at 1026.[31]
Mr. Hutsell asserts the error was not harmless because the evidence against him was not "overwhelming." We disagree and find sufficient evidence, as discussed supra , was presented to convict Mr. Hutsell of committing second degree murder, and the verdict was surely unattributable to any possible error by the district court in admitting the allege other bad acts/crimes evidence.
This assignment of error lacks merit.
ASSIGNMENT OF ERROR NO. 4: DENIAL OF CHALLENGE FOR CAUSE
Mr. Hutsell contends that the district court abused its discretion when it denied his challenge for cause as to prospective juror number 21, R.C.[32]
During voir dire , the defense questioned the second panel about Mr. Hutsell's right to remain silent, and inquired:
MS. CHERVINSKY [Defense]:
All right. We all know and we've heard that Mr. Hutsell does not have the duty to testify. He's not required to testify. He has a right to remain silent. As I stand here, I don't know if he's going to testify or not. Right? That's a decision that he makes with his lawyers once the State has presented their case. So he may, he may not.
Is there anyone here who feels like-I think we had a juror on the last panel who said, you know, if I'm charged with a murder and I didn't do it, you know, I'm getting on the stand. And if he doesn't. I'm going to think that he maybe has something to hide. Is there anybody who feels that way about it?
R.C. responded that it would plant "a seed of doubt" in his mind about whether the Defendant was innocent. R.C. expressed that he would expect or hope the Defendant would testify, and although he believed *561 the defendant should testify to prove his innocence, if instructed by the judge not to consider that, he could make a decision.
After the conclusion of the voir dire of the second panel, the defense counsel challenged R.C. for cause on the grounds R.C. expressed his inability to be fair. The defense counsel explained that "he [R.C.] said that he had a belief that it wouldn't change even if [sic] judge told him so, as far as holding against Mr. Hutsell if he didn't testify." The State countered, although R.C. expressed the Defendant's failure to testify would worry him, R.C. indicated he could follow the law. The district court denied the challenge and noted the defense's objection. Following, the defense used a peremptory challenge to strike R.C. from the jury.
Mr. Hutsell argues R.C.'s responses revealed that R.C. would hold it against him if he did not testify and that R.C. was unable to set aside his beliefs no matter what the judge instructed him on the law.
The State argues that "only [R.C.'s] agreement to leading questions posed by defense counsel indicated he may have been unable to set his personal beliefs aside and follow the trial court's instructions." The State explains that "[w]hen [R.C.] was asked an open-ended question regarding whether he could put his personal beliefs aside and follow the judge's instruction, he responded that 'if I was supposed to make a decision, I would make a decision.' "[33]
Louisiana Constitution article I, § 17 guarantees to a defendant the right to full voir dire examination of prospective jurors and the right to challenge jurors peremptorily. Louisiana Code Criminal Procedure Article 797 sets forth the grounds for which a juror may be challenged for cause which includes "[t]he juror is not impartial, whatever the cause of his partiality," and "[t]he juror will not accept the law as given to him by the court." La. C.Cr.P . art. 797(2) and (4).
In a trial for an offense necessarily punishable by imprisonment at hard labor, such as in the present case, the defendant shall have twelve peremptory challenges. La. C.Cr.P. art. 799. If a defendant exhausts his peremptory challenges, he only has to show that the trial court abused its discretion by denying a challenge for cause and no additional showing of prejudice is required. State v. Taylor , 97-0927 (La. App. 4 Cir. 5/19/99), 735 So.2d 908, 910 (citations omitted).
In the case sub judice , the defense used all of its peremptory challenges, including one to excuse R.C. from the jury. As a result, the only element Mr. Hutsell must prove on appeal is that the district court abused its discretion in denying his challenge for cause against R.C.
In State v. Coleman , 14-0402, pp. 48-49 (La. 2/26/16), 188 So.3d 174, 211, cert. denied , --- U.S. ----, 137 S.Ct. 153, 196 L.Ed.2d 116 (2016) (citation omitted), the Supreme Court set forth the standard for reviewing a denial of a challenge for cause and explained that "[i]n ruling on a challenge for cause, the trial court is vested with broad discretion and its ruling will be reversed only when the voir dire record as a whole reveals an abuse of discretion." In State v. Washington , 15-0819, pp. 4-5 (La. App. 4 Cir. 2/17/16), 187 So.3d 71, 74, writ denied , *562 16-0488 (La. 3/31/17), 217 So.3d 358, this Court provided guidance when reviewing a challenge for cause as follows:
When assessing whether a challenge for cause should be granted, the district judge must look at the juror's responses during his or her entire testimony, not just "correct" isolated answers or, for that matter, "incorrect," isolated answers. Id. [ State v. Lindsey, p. 3 (La. 1/17/07), 948 So.2d 105, 107-08.] A prospective juror's seemingly prejudicial response is not grounds for an automatic challenge for cause, and a district judge's refusal to excuse him on the grounds of impartiality is not an abuse of discretion, if after further questioning the potential juror demonstrates a willingness and ability to decide the case impartially according to the law and evidence. Id., 06-255, p. 4, 948 So.2d at 108.
In a similar case, State v. Passman , 345 So.2d 874 (La. 1977), the prospective juror expressed he may have trouble deciding the case if the defendant did not testify. During voir dire , defense counsel asked the prospective juror whether he would be able to consider defendant's guilt or innocence, without being influenced by whether the defendant took the stand on his own behalf. The prospective juror replied that he might be influenced by this fact "according to how bad the case went against him or for him." Id. at 879. When the prospective juror was asked whether he could follow the judge's instruction not to consider this fact in weighing the defendant's guilt, the juror responded, "I may have trouble and I may not." Id. The defendant moved to excuse the prospective juror for cause on the ground the juror would not accept the law as given to him by the court. The prospective juror was questioned by the trial court. The trial court asked if instructed to not take into consideration the defendant's decision not to testify, could the prospective juror put it out of his mind his belief that "the man should tell his side?" Id. at 880. The prospective juror responded, "I believe I can [d]o it. Yes, sir." Id. The trial court further inquired, "Don't tell me you believe you can. Do you think you can?" The prospective juror responded, "I believe-yeah. I believe so." Id. The Supreme Court held "when taken as a whole," the prospective juror's voir dire did not support the defendant's contention that the trial judge's ruling constituted an abuse of discretion. Id.
Recently, the Supreme Court, in State v. Dotson , 16-0473 (La. 10/18/17), 234 So.3d 34, emphasized that the entire voir dire should be considered when reviewing a trial court's denial of a prospective juror for cause. In Dotson , the issue was whether the prospective juror, K.C., whose mother had been raped and murdered, could be impartial. When asked by the trial court if the circumstances related to her mother's death had any bearing on her ability to be impartial, K.C. stated, "[y]es, it might." Id. , 16-0473, p. 9, 234 So.3d at 41. No direct follow-up questions were asked by the trial court, the state, or the defense as to this particular response.
The Supreme Court found that the prospective juror's use of the word "might" concerning the impact that her family member's ordeal as a victim of a similar crime on her ability to be impartial rendered her response equivocal, and it found because of the equivocalness of the juror's response, the need for rehabilitation by the state had not been triggered. The Supreme Court explained:
Based on the qualification of K.C.'s [prospective juror] affirmative response, this court cannot say that the trial court erred or abused its discretion in finding that K.C. at no point declared that she could not be impartial in these cases; nor from this lone response can "bias, prejudice, or the inability to render *563 judgment according to law ... be reasonably implied," ....
Id. , 16-0473, pp. 12-13, 234 So.3d at 42 (citation omitted)(footnotes omitted). Continuing, the Supreme Court summarized its ruling by stating:
Clearly, La. C.Cr.P. art. 797(2) does not require that a prospective juror state with absolute certainty that he/she cannot be impartial in order to be removed for cause. However, in the absence of such a statement, the trial court's denial of a challenge for cause will not be reversed if, on review of the entire voir dire examination, the prospective juror demonstrates a willingness and ability to decide the case impartially according to the law and evidence. [ State v. ] Passman , 345 So.2d [874] at 880 [ (La. 1977) ]. Reversal is appropriate only where it appears, upon review of the voir dire examination as a whole, that the trial judge's exercise of that discretion has been arbitrary or unreasonable, resulting in prejudice to the accused. Id. ; see [State v. ] Dorsey , 10-0216 at 28, [ (La. 9/7/11) ] 74 So.3d [603] at 625 ; State v. Lee , 93-2810 (La. 5/23/94), 637 So.2d 102, 108. This standard of review is utilized "because the trial judge has the benefit of seeing the facial expressions and hearing the vocal intonations of the members of the jury venire as they respond to questions by the parties' attorneys." Lee , 93-2810 at 9, 637 So.2d at 108. "Such expressions and intonations are not readily apparent at the appellate level where review is based on a cold record." Id. As noted in State v. Miller , 99-0192 (La. 9/6/00), 776 So.2d 396, because of the "complicated and oftentimes daunting" task faced by a trial court in deciding "challenges for cause of prospective jurors who give equivocal ... responses during voir dire ," "an appellate court should accord great deference to the [trial] court's ruling on a challenge for cause, which is necessarily based, in part, on the court's personal observations during questioning." Id. , 99-0192 at 14, 776 So.2d at 405-06.
Id. , 16-0473, p. 17, 234 So.3d at 45 (footnotes omitted).
In accordance with Louisiana jurisprudence, we have reviewed the entirety of the voir dire and find the district court did not abuse its discretion in denying the challenge of cause of R.C.
During voir dire , R.C. was part of the second panel of prospective jurors. The second panel was seated in the courtroom and was able to hear the questioning of the first panel of prospective jurors. The second panel was asked several questions such as whether they could: find a person guilty who intended only great bodily harm but it resulted in death; judge someone's intent; render a verdict based on a single witness; judge a witness' reliability and credibility; and apply the standard of reasonable doubt. Additionally, the defense asked the second panel whether anyone had a problem believing a defendant was innocent or thought that just because a defendant was in court charged with a serious crime, he did something. There was no response from R.C. indicating he had any problem with these principles of law. In a colloquy between the State, the defense, and R.C., R.C. provided the following noteworthy responses:
MS. DAWKINS [State]:
[I]s there anybody else who has any issue with rendering a verdict that would result in a life sentence? And I'll start with you, [R.C.].
R.C.:
If it's proven beyond a reasonable doubt, probably not, no.
* * *
*564 MS. DAWKINS:
So is there anybody here who would require DNA evidence or video evidence? And we can take those questions in turn, if anybody has anything they would be unable to render a verdict if they didn't see DNA evidence....
* * *
R.C.:
I think it would help.
MS. DAWKINS:
And so tell us what you think about that, [R.C.], why do you think it would help?
R.C.:
The more evidence you have, the better.
* * *
MS. CHERVINSKY [Defense]:
So we have all heard the expression that people are innocent until proven guilty.
[R.C], what does that mean to you, innocent until proven guilty?
R.C.:
He is innocent. There's nothing-he is-I mean, you know what innocent is; he didn't do anything wrong. But they have to be-their guilt has to be proven.
Like the prospective juror in Passman , while R.C. expressed that he would expect or hope that Mr. Hutsell would testify to prove his own innocence, he indicated he could follow the law. Further, R.C.'s responses to questions, regarding the State's obligation to prove its case against Mr. Hutsell beyond a reasonable doubt, shows he fully understood the State's burden. Thus, R.C.'s ability to be impartial and follow the law is supported by the entire voir dire .[34]
As outlined in Dotson , the district court had the benefit of seeing R.C.'s facial expressions and hearing R.C.'s vocal intonations as he responded to the questions asked by the attorneys, and we find the district's court's ruling that denied the challenge for cause of R.C. was not arbitrary or unreasonable to prejudice Mr. Hutsell to his detriment in obtaining a fair and impartial trial.[35] Accordingly, we find no abuse of discretion by the district court in denying the defense's challenge for cause of R.C.
CONCLUSION
Mr. Hutsell's conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED

On March 4, 2016, Mr. Hutsell entered a plea of guilty to obstruction of justice. The district court sentenced him to serve one year at hard labor. Mr. Hutsell does not seek review of this conviction and sentence.

On November 3, 2015, a competency hearing was held. At the conclusion of the hearing, the district court found Mr. Hutsell competent to proceed to trial.

Trial commenced on November 9, 2015. On the following day, counsel for Mr. Hutsell filed a motion for mistrial alleging a conflict of interest and the district court granted the motion. The State sought review, and this Court denied the State's writ. State v. Hutsell , 15-1242 (La. App. 4 Cir. 11/13/15) (unpub.). However, the Louisiana Supreme Court granted the State's writ application, reversed the district court's ruling, and denied Mr. Hutsell's motion for mistrial. State v. Hutsell , 15-2092 (La. 11/15/15), 184 So.3d 2. Trial resumed on November 16, 2015.

On February 4, 2015, prior to sentencing, Mr. Hutsell, through his attorney, filed a motion for new trial and post-judgment verdict of acquittal and a motion for appeal. The district court denied the motion for new trial and post-judgment verdict of acquittal, and it granted the motion for appeal as to the second-degree murder conviction.

During the trial, a large map of New Orleans was admitted into evidence to identify the McDonald's located at 3025 Elysian Fields Avenue, where the victim was stabbed; the Truck Stop, located at 2411 Elysian Fields Avenue, where witnesses stated they observed the perpetrator after the stabbing; and, the Casino located at 2401 Elysian Fields Avenue, where Mr. Hutsell was apprehended. The Truck Stop and Casino are located in the same area, and the witnesses, throughout the trial, referred to the Truck Stop and Casino interchangeably.

Mr. Robertson admitted he had prior convictions and was recently arrested on an outstanding warrant when he came to the courthouse to testify in this case.

This photograph was admitted into evidence and published to the jury.

Ms. Songer testified that Ms. Anderson told her that she wanted to get away from Mr. Hutsell, and she did not want to be with him anymore. The defense objected to this testimony as hearsay, and the objection was sustained by the district court.

At trial, the recorded 9-1-1 calls were played for the jury and the incident recall sheet, reflecting the time and content of the 9-1-1 calls, was published to the jury to read while the 9-1-1 tapes were played. The incident recall sheet reflects, "Incident Created: 3/19/2015 11:22.01 PM."

Ms. Jones did not testify at trial.

In court, Detective James identified Mr. Hutsell as the one identified by Ms. Jones.

Detective Sykes was employed by New Orleans Police Department.

Detective Sykes explained that, generally, in a show-up identification procedure, a witness is placed in a police vehicle and driven to the location where a defendant has been apprehended. While the witness is in the police vehicle, the suspect is brought in front of the vehicle, and a light is shone on the suspect.

According to the detective, the Timberland boot was recovered by police, and DNA testing indicated Mr. Hutsell's DNA on the boot.

The surveillance video was admitted into evidence and published to the jury.

The photographs were admitted into evidence and published to the jury.

The black material, hat, skateboard, and backpack were admitted into evidence and published to the jury.

SPCA removed the dog from the scene and located a chip inside the dog that allowed the dog to be traced back to Ms. Anderson's mother. Ms. Anderson's mother was able to identify her daughter through a distinct tattoo she had on her hand.

La. Code Crim. Proc. art. 873 provides:
If a defendant is convicted of a felony, at least three days shall elapse between conviction and sentence. If a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled. If the defendant expressly waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately.

In Scott , 15-0778, pp. 9-10, 197 So.3d at 304-05 (footnote omitted), this Court explained:
[T]o prove second degree murder the state must prove the killing of a human being either with specific intent or when the offender is engaged in one of the listed crimes. State v. White , 14-0397, p. 17 (La. App. 4 Cir. 7/29/15), 174 So.3d 177, 189. "In addition to proving the statutory elements of the charged offense at trial, the state is required to prove a defendant's identity as the perpetrator."State v. Page , 08-531, p. 6 (La. App. 5 Cir. 11/10/09), 28 So.3d 442, 447.

Mr. Hutsell's counsel made this admission during opening and closing statements. See also Defendant's Hypothesis of Innocence discussed infra .

The jurors viewed pictures of Mr. Hutsell which depicted his facial tattoos. These photos were taken at the time he was apprehended at the Casino, around twenty-minutes after the victim was stabbed. Additionally, the jurors viewed Mr. Hutsell in court.

The General Charge filed in the record indicates the district court issued the following instruction regarding identifications:
In determining whether or not the accused has been identified as the person who committed the offense charged against him, you must consider all of the evidence and/or lack of evidence regarding this issue, considering the means of identification; the circumstances under which he was identified, the opportunity for identifying the said accused; the influence, if any, brought to bear on persons claiming to identify the accused; the description of his apparel and/or a description of his physical characteristics as stated by the witnesses, and the probabilities or improbabilities that it was the accused, and if after so judging and weighing the evidence, you are not satisfied beyond a reasonable doubt that the accused has been correctly identified as the person who committed the offense charged in this bill of information/indictment, it will be your duty to find the accused not guilty. On the other hand, if you are satisfied it will be your duty to find the accused guilty.

La. C.Cr.P. art. 803 provides in part, "[w]hen a count in an indictment sets out an offense which includes other offenses of which the accused could be found guilty under the provisions of Article 814 or 815, the court shall charge the jury as to the law applicable to each offense."

The defense admits there is no ruling on the written motion writing, "The trial court apparently denied the motion....although there is no indication of such on the motion itself." In State v. Walton , 06-2553, p. 1 (La. 6/1/07), 957 So.2d 133, 134 (citing State v. Wagster, 361 So.2d 849, 856 (La.1978) this Court noted: "As a general rule, counsel's failure to obtain a ruling on the merits would constitute an abandonment of the motion."

The motion for new trial provided that "[t]he defense moved for special jury charges for this case. The Court denied defense requests for ... eyewitness identification. Denial of these instructions showed prejudicial error."

We note, although not asserted by Mr. Hutsell, this alleged error is not so significant "that the fundamental requirements of due process would be violated" requiring an exception to the contemporaneous objection rule. State v. Jarvis , 01-1277, p. 4 (La. App. 4 Cir. 2/13/02), 811 So.2d 38, 40 (citing State v. LeBlanc , 97-1388 (La. App. 4 Cir. 9/23/98), 719 So.2d 592 ). In LeBlanc, this Court reviewed the assigned error, although the defendant failed to object before or during the trial, regarding the trial court's failure to properly instruct the jury on an instruction that went to the very definition of the crime. Also, in LeBlanc , 719 So.2d at 595 (citing State v. Thomas , 427 So.2d 428 (La. 1982) ), this Court cautioned that the exception does not authorize appellate courts to review every alleged erroneous jury instruction without following the requirements of La. C.C.P. art. 841.

State v. Prieur, 277 So.2d 126 (La. 1973).

The introduction of character evidence is governed by La. C.E. art. 404(A), which provides (with exceptions) that "[e]vidence of a person's character or a trait of his character, such as a moral quality, is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion." Likewise, La. C.E. art. 404(B) prohibits evidence of other crimes, wrongs or acts to prove the character of a person. Such evidence, however, is admissible if the State proves an independent reason.

Testimony regarding Mr. Hutsell's relationship with Ms. Anderson may have been admissible under La. C.E. 404(B). In State v. Rose, 06-0402, p. 15 (La. 2/22/07), 949 So.2d 1236, 1245, the court held that "evidence that defendant physically abused Ms. Rose is independently relevant to show the volatile nature of the relationship between defendant and Ms. Rose. This evidence tends to show defendant's motive for commission of Ms. Rose's murder." Also, in State v. Marshall, 13-233, p. 7 (La. App. 5 Cir. 10/30/13), 128 So.3d 1156, 1161, the court held, "defendant's prior acts of domestic abuse against Ms. Wells were independently relevant to show the volatile nature of the relationship between him and the victim."

"[A]n error is harmless if it is unimportant in relation to the whole and the verdict rendered was surely unattributable to the error." State v. Blank , 04-0204, p. 53 (La. 4/11/07), 955 So.2d 90, 133 (citing State v. Seals, 95-0305 (La. 11/25/96), 684 So.2d 368, 377, cert. denied , 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997) ).

To protect the juror's privacy, we choose to use the juror's initials instead of the juror's name.

The State further asserts Mr. Hutsell limited his challenge to R.C. on the ground he would not be impartial, and Mr. Hutsell waived his challenge to R.C. on the ground he could not follow the law citing La. C.Cr.P. art. 800(A). However, we find the defense's argument to the district court was sufficient to preserve both grounds for appeal.

In contrast, the district court granted the defense's challenge for cause of prospective juror 41 when he repeatedly and unequivocally indicated he would hold it against Mr. Hutsell if he did not testify.

Mr. Hutsell cites State v. Cross , 93-1189 (La. 6/30/95), 658 So.2d 683 in support of his assigned error. In Cross , the Supreme Court found the trial court abused its discretion in denying the challenge for cause based on the prospective juror's voir dire response to the possibility that the defendant would not testify. When the prospective juror was asked whether he would be more likely to convict based on the defendant's failure to testify, the juror stated that it would "leave him confused, definitely," and that it would affect his ability to be a fair juror. Id. , 93-1189, p. 8, 658 So.2d at 687. Unlike the prospective juror in Cross , R.C.'s did not unequivocally express Mr. Hutsell's failure to testify would affect his ability to be a fair juror.